# Austin et ux., Appellants, *v.* Hines, Director General.

*Negligence—Railroads—Government control—Property not used in transportation—Fall of wall on such property—Acts of Congress of August 29, 1916, 39 Stat. L. 645, March 21, 1918, 40 Stat. L. 451, March 2, 1919, 40 Stat. L. 1290—President's proclamation of Dec. 26, 1917, 40 Stat. L. 1733.*

1. The Acts of Congress of August 29, 1916, 39 Stat. L. 645, and March 21, 1918, 40 Stat. L. 451, and the President's proclamation of December 26, 1917, 40 Stat. L. 1733, relating to the government control of railroads, were intended to embrace all property used or useful in transportation business, but not property disassociated therefrom, or property that did not presently aid the transportation system, or from which such assistance could not be expected in a reasonable time.

2. Federal control of railroads did not extend to its property of all kinds, tangible and intangible, and general control of all its functions. The President's proclamation did not go beyond the terms of the acts. Acts of a supervisory character are not sufficient on which to base possession and control.

3. The acts recognized a well marked distinction between the officials and employees connected with the transportation system, and other officials and employees having charge of the other business and properties of the railroad companies.

4. Where a wall is left in a dangerous condition on a lot of land owned by a railroad company at the time of the assumption of government control, the director general will not be liable for injuries to a boy by the fall of the wall, where it appears that the lot was not used as a part of the railroad transportation system, and was not immediately intended for such use.

5. In such case the fact that the director general, who had assumed no control over the lot under the Act of Congress of March 2, 1919, 40 Stat. L. 1290, consented to the execution of a contract by the company between it and the borough relating to the general scheme involved, did not fix any liability upon him.

Argued October 1, 1923. Appeal, No. 51, Oct. T., 1923, by plaintiffs, from judgment of C. P. Beaver Co., June T., 1919, No. 292, for defendant n. o. v., in case of Joseph

M. Austin et al. v. Walker D. Hines, Director General of Railroads. Before MOSCHZISKER, C, J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Trespass for death of plaintiff's son. Before READER, J. The opinion of the Supreme Court states the facts.

Verdict for plaintiffs. Judgment n. o. v. for defendant. Plaintiffs appealed.

*Error assigned* was judgment n. o. v., quoting record.

*A. P. Marshall,* for appellant.

*William A. McConnel,* with him *S. P. McConnel,* for appellee.

OPINION BY MR. JUSTICE KEPHART, January 7, 1924:

Appellants brought this action against the director general of railroads to recover damages for the death of their minor child. The right to sue appellee was denied by the court below; hence this appeal. The circumstances leading to the death of the child as establishing negligence in some one is not disputed; appellants urge the director general is the one so liable.

At the beginning of the war, the Pittsburgh, Fort Wayne & Chicago Railroad, an operating carrier, was located, at one point, on Fifth Avenue, New Brighton. Then, and for a long time prior thereto, the company had in contemplation a change of line to the east bank of Beaver Creek, some distance from its present location. Numerous pieces of land were purchased along the proposed change; one in particular, owned by Strock, was so purchased in 1905, title being taken in the name of the Pittsburgh, Youngstown & Ashtabula Railroad Company. It fronts on Race Street at the intersection of that and Eighth Street. At the time of the accident an old, unoccupied, two story brick house was located on this

lot, flush with Race Street, a public highway. The building had been sold to a third person who had removed the rafters, roof, joists and practically all the timber, leaving the walls unsupported. They collapsed on the evening of February 23, 1919, one wall falling to the street in front, killing Leo Austin, a child ten years of age, son of the plaintiffs.

No change had been made in the line of the railroad, and up to February 23, 1919, no construction work of any character had been done on this lot by the railroad company or the United States Railroad Administration. Other than the fact that it might ultimately be used for transportation purposes, there is no evidence that the land was part of the system, or in any manner used by the United States.

The court below did not discuss the question of liability save that of the director general, and held the United States railroad administration was not in such possession and control of the property in question as to be liable under the acts of Congress or the President's proclamation.

When war was declared between Germany and the United States, the government, under then existing laws, took over the operation of the railroads of the country. The President was empowered through the secretary of war to take possession and control of every system of transportation and all parts thereof, to utilize the same for the transportation of troops or any purpose connected with the emergency. The President's proclamation did not go beyond the power conferred by Congress, and the Federal Control Act did not enlarge that power as it relates to the question now discussed. From the promulgation of the proclamation control and possession of all transportation systems was deemed to be in the United States Railroad Administration, without further act or notice. Act of Congress, August 29, 1916 (39 Stat. 645, U. S. Compiled Statutes, 1916, section 1974a) ; Federal Control Act of March 21, 1918, c. 25

'(40 Statutes 451) ; President's Proclamation of December 26, 1917 (40 Statutes 1733). Under this authority it has been held that over all the transportation systems there was but one administration, one power, with complete possession by government authority to replace for the period provided the private ownership theretofore existing: Northern Pacific Ry. Co. v. State of North Dakota, 250 U. S. 135, 148.·

The intendment of the acts was to secure possession and control of the systems of transportation, including all the necessary physical property. This included all property used or useful in connection with the transportation business, but did not embrace, directly or indirectly, property disassociated from and independent of the system or property that did not presently aid the transportation system, or from which such assistance could not be expected in a reasonable time. It covered all property reasonably necessary for the operation of the various transportation systems as such or incident thereto.

The legislation did not intend the government should exercise complete dominion over property of every character, tangible and intangible, of the railroads, or generally to control all their functions, prosecuting the corporations' business to the same extent as under private ownership; but it did take over the transportation system with its allied properties. As to such property its possession and control were absolute; the director general would be liable for neglect of duty in connection with the operation or maintenance of this system. Northern Pacific Ry. Co. v. State of North Dakota, supra.

The transportation system took over all the managing executives, officials and employees down the line necessary to the conduct of the business. The other executives, officers and employees not so connected remained with the companies as such executing officers and em-

ployees.    The distinction was well marked and recognized.

Had Congress intended otherwise it would have so stated, but as the corporations themselves were not taken over and did not cease to function as such, their control, limited it is true, was still completely exercised over property not within the war power of the various acts. The companies, many of them, continued to pay dividends, collected rents of properties not necessary for transportation business, and otherwise acted as corporations. When federal control attached, this land was not only not an essential part of the transportation system, but was no part of it; nor did it at any time during such control assume such character.

The present railroad company, for a number of years prior to the war, had contemplated this change of line. It had acquired a number of properties for the purpose. There remained quite a number of properties on the proposed line that had not been purchased up to the time of the last trial of this case.    Construction work had been commenced from a point about ten squares south of this property, and northwardly several squares from the property.    Some trestle work had been completed on other land, but no tracks had been laid.    Work on the proposed improvement ceased during the war.

While the proposed change of line might ultimately become a part of the transportation system, its completion was remote; the strongest reason for excluding it as part of the system was, that the government, when it took over the road, found on Fifth Avenue this carrier's line, well developed, in full operation, more than adequate for all its needs or purposes.    If the government had been embarking in railroad business generally and for all time this improvement might ultimately be worth while.    Federal control of the roads was special and temporary.    While in control, what was needed was adequate facilities for the expeditious handling of war materials, including as well the country's business.    Now,

an improvement begun twelve years before, not nearly completed when the war began, stopped during the war, and not yet completed, could hardly be considered as coming within the shadow of aggressive prosecution of the war, utilizing all transportation facilities to that end. The worked portions were separated, disconnected and not useful for any purpose then and up to the present time. Such property remained with the corporation, which was vested with its rights and subject to liability as it existed prior to the act of Congress.

An incompleted betterment such as this could in no sense be considered as within the terms of the acts: U. S. R. R. Administration, McAdoo, Director General of Railroads v. Burch, 254 Fed. 140; Schumacher v. P. R. R. Co., 106 Misc. 564, 175 N. Y. S. 84; Nash v. Southern Pacific Co., 260 Fed. 280.

Our conclusion does not rest on the absence of evidence from the company's minutes, showing corporate action in the adoption of the proposed change of line through this land, or that the contract hereinafter referred to might supply that omission.

Did the government in fact consider and make it a part of the transportation system, assuming possession and control? As we have indicated, the acts of Congress not only designated the character of property taken over by the government, but, we take it, the power of the government was limited to such property. We need not decide whether the government could act contrary to the express terms of the act by taking property not clearly within the transportation system, for in this case we hold the government did not take possession and control.

Section 7 of the Act of Congress of March 2, 1919, c. 95 (40 Statutes 1290), established a revolving fund of $500,000,000 to provide for transportation facilities, and, later, "the President may also make or order any carrier to make any additions, betterments, or road extension, etc." It does not appear the United States ever acted

under this authority, and the director general has done nothing whereby the government might be considered as a party to the work, or from which an inference could be drawn that possession and control of the property was intended. The only evidence advanced in support of a contrary belief is the contract relating to this improvement between the borough and the company as lessee. As to this, the director general merely consented to the company's execution and delivery of the contract. Why he did so does not appear; he was not involved in any way, nor does the contract in the slightest degree involve him. The agreement was between the borough and the company. It was assumed there was a supervising control over the company's expenditure of money in the improvement contemplated. However that may be, the director general was not bound by any covenants in the contract. Like all contracts made subject to federal and state laws, the approval of government agencies was provided for, and the liability of the company for certain of its acts was dependent on the approval of the director general. This was merely to protect the railroad against contingencies which might arise out of federal control, and related chiefly to the time of performance. The consent of the Pennsylvania Public Service Commission was not obtained until March 4, 1919, which of itself would seem to have continued the time of performance. Such acts are not evidence of control and possession of the specific property, nor of the improvement contemplated. Had the improvement been predicated on an order of the administration, it could easily have been shown. The word "carrier" in this section refers to the transportation system as distinguished from the corporate owner (Missouri Pacific Railroad Co. v. Ault, 256 U. S. 554), and it was on this character of property the section operated. It may be possible the director general could so control corporate owners in the expenditure of the latter's funds as not to interfere with the successful operation of the transportation system; if so, the con-

sent of the director general obviated any difficulty on that score as well as protected it against claims by the borough if a different course were pursued; but this was not the assumption of possession and control by the government.

As we view the acts of Congress and the President's proclamation, this property was not such as was essentially necessary to the transportation system; nor was it at any time brought within that system; nor did the director general commit the government to responsibility for either the construction of the improvement or liability which might arise by reason of the private ownership of this property by the company. Since the director general had no power or control over the property, he is in no way responsible for its condition.

The judgment of the court below is affirmed.