Edward Hines Yellow Pine Trustees *v.* Davis, Director General of Railroads and Agent of the President.[*]

(Division A.    Jan. 10, 1927.    Suggestion of Error Overruled Feb. 21, 1927.)

[111 So. 296.    No. 25811.]

1. Railroads.    *Declaration alleging director general's abandonment of construction of road held to state cause of action against federal Agent (Transportation Act 1920, section 206 [a], being Comp. St., section 10071¼cc).*

Declaration alleging contract with railroad company for construction of railroad was assumed by director general of railroads on taking over railroads, and subsequently abandoned with re-

sulting damages, *held* to state cause of action which is authorized to be brought against agent of President under Transportation Act of 1920, section 206 (a), being Comp. St., section 10071¼cc.

2. RAILROADS. *Averments as to director general's assumption of contract to construct railroad and abandonment thereof held sufficient against demurrer (Transportation Act of 1920, section 206 [a], being Comp. St., section 10071¼ cc).*

Averments of declaration as to assumption of contract for construction of railroad by director general on taking over railroads, and his abandonment after partial performance thereof, *held* sufficient to show authority to bring suit against Agent, under Transportation Act 1920, section 206 (a), being Comp. St., section 10071¼cc, as against demurrer.

---

*Corpus Juris-Cyc. References: Railroads, 33Cyc, p. 45, n. 36.

APPEAL from circuit court of Forrest county.

HON. R. S. HALL, Judge.

Suit by Edward Hines Yellow Pine Trustees against James C. Davis, Director General of Railroads, and agent of the President. Judgment dismissing the suit, and plaintiff appeals. Reversed and remanded.

*T. W. Davis, Wm. S. Bennett* and *H. Cassedy Holden,* for appellants.

The question involved is the liability of the appellee under section 206 (a) of the transportation act of 1920 as the officer against whom by statute suit must be brought in causes of action arising out of the possession, use, or operation by the president of the railroad system or transportation of any carrier of such character as prior to federal control could have been brought against such carrier. For prior statutes involved, see statement in *New Jersey Ship Building & Dredging Co.* v. *Davis,* 11 Fed. (2nd) 994 at 995.

Under section 206 (a) not only the appellant but all persons similarly injured have no redress against any person except the agent of the president appointed pur-

suant to that section.    Under the ruling of the court below, neither the appellant, nor any other person similarly situated has, therefore, any recourse or redress under similar circumstances against any person.    For this position of the court below there is no support in the decisions.    *New Jersey, etc., Co.* v. *Davis,* 11 Fed. (2nd) 994 at 997; *Davis* v. *Newton Coal Co.,* 267 U. S. 292; *Baggott* v. *So. R. R. Co.,* 300 Fed. 337; *Amicon Fruit Co.* v. *Davis,* 299 Fed. 120.

In each of these cases a duty was owing to the plaintiff by the railroad prior to federal control, just as here a duty was owing from the G. & S. I. Railroad Company to the lumber company.    That duty was not discharged by the railroad.    The director general came in and did not discharge it, and thus became liable for resulting damages.    See *Wyoming Sugar Co.* v. *Davis, Director General,* 7 Fed. (2nd) 622 at 624; *Wilson* v. *Davis,* 8 Fed. (2nd) 484 at 486; *McDaniel* v. *Hines,* 239 S. W. 471; *Nealy* v. *Payne* (Miss.), 89 So. 669.    As the section is so new, this comprises practically all of the important decisions under it and, as stated, in none of these decisions has jurisdiction been refused.

To hold the Director General liable for injuries caused by his failure to act is in line with the entire spirit and intent of all the acts passed in connection with private persons during the war period.    See *Missouri Pac. R. R. Co.* v. *Ault,* 256 U. S. 554 at 557; *Northern Pac. Ry Co.* v. *North Dakota,* 250 U. S. 135 at 148.

*T. J. Wills* and *Angus A. McLaughlin,* for appellee.

I.    Is the United States liable to the appellant on account of taking the railroad property of the Gulf & Ship Island Railroad Company and thus depriving the railroad company of ability to perform its contracts with appellant?

In determining the effect of the taking of the railroads by the government upon persons having relations through

contracts or otherwise with carriers whose properties were taken, it will be well to consider briefly the character of the taking and the relation of the government after the taking, to the owners of the property taken. See *North Carolina R. R. Co.* v. *Lee,* 260 U. S. 16, 67 L. Ed. 104; *Dupont-De Nemours & Co.* v. *Davis,* 264 U. S. 456, 68 L. Ed. 788.

A logging railroad in process of construction, not then engaged in transportation, and judging from the contracts relied upon, not intended for general transportation, could by no process of reasoning or construction be deemed to be within the description of the property described in the president's proclamation. This thought is emphasized by the supreme court of Pennsylvania in *Austin* v. *Hines, Director General,* 123 Atl. 502-04.

The facts of this case make it peculiarly apt in reference to the case at bar. It was an incompleted project that could not aid in transportation in the emergency, and to burden the government with carrying same out would tend to defeat the purpose of taking over the railroads, which was to devote same exclusively, if necessary, to the prosecution of the war.

The taking of the railroad was then a taking of property of the railroad company, engaged in general transportation, for public use, as an aid in the prosecution of war by the government under its power of eminent domain, with the obligation of the government to make just compensation to the owner of the property, but without any obligation of the government to compensate third parties whose property was not taken but who suffered consequential injury because of the taking by the government of the property of the carrier.

That the government did not thus become liable to third persons does not need extended discussion in view of the very complete discussion in the recent opinion of the supreme court of the United States in *Omnia Commercial Co.* v. *U. S.,* 261 U. S. 502, 67 L. Ed. 773 (1923). In this case the taking of the entire product of the steel

company's plant and forbidding the steel company to carry out the contract with appellant, absolutely prevented the appellant from receiving any of the benefits of the contract. While the amended declaration alleges that the taking of the railroad by the government rendered the Gulf & Ship Island Railroad Company unable to carry out the contract, there are no allegations supporting such conclusion. There is nothing in the amended declaration to indicate the Gulf & Ship Island Railroad company was financially able to continue the carrying out of its contract, and we are inclined to the view that such statement is but a mere legal conclusion which is not admitted by demurrer. See *St. L. R. R. Co.* v. *U. S.,* 267 U. S. 346 at 349.

II. Did the United States, by reason of taking the property of the Gulf & Ship Island Railroad Company, adopt and become liable to appellant upon the contracts in controversy? There is no allegation in the amended declaration supporting such contention. From the carefully circumscribed description of the property taken, as set forth in the president's proclamation, it would seem perfectly clear that obligations of this character were not within the contemplation of the president as obligations to be assumed because of the taking of the railroads. *Martin* v. *Richmond, F. & P. R. Co.,* 3 Fed. (2nd) 26.

We say, therefore, that the mere taking of the railroad of the Gulf & Ship Island Company, even though we assume such taking had the effect of rendering the railroad company unable to carry out its contracts with appellants, did not place upon the government or the director general the obligation to perform such contracts and the circuit court was right in adopting such view and in following the Omnia Commercial Company decision.

III. Did the United States, by reason of partial performance of said contracts by the Director General, be-

come liable for failure to completely perform such contracts?

The amended declaration nowhere suggests that the starting of the work, by the Director General, caused appellant any damage. The mere fact that the Director General did in part what the Gulf & Ship Island Railroad Company had obligated itself to do, will not, without more, create a liability on the part of the Director General to complete such contracts.

IV. Is the cause of action alleged in the amended declaration of the character described in section 206-a, Transportation Act, 1920, for which a suit is authorized to be brought against agent to be appointed by the president? A suit against the agent to the appointed by the president under section 206-a of the transportation act of 1920 is a suit against the United States. See *Mo. Pac. R. R. Co.* v. *Ault,* 256 U. S. 554; *Dahn* v. *Davis,* 258 U. S. 421; *E. I. Dupont de Nemours & Co.* v. *Davis,* 264 U. S. 456; *Davis, Agent,* v. *Donovan,* 265 U. S. 257.

Since the suit is one against the government, the familiar rule applies that the government cannot be sued without its consent and when the government consents to be sued, the consent must be strictly followed and complied with. *Beers* v. *Arkansas,* 61 U. S. 20; *Carr* v. *U. S.,* 98 U. S. 433; *Hans* v. *State of Louisiana,* 134 U. S. 1; *Stanley* v. *Schwalby,* 162 U. S. 255.

The cause of action here sued on is not one arising out of the operation of the railroad by the president and is not one for which suit, prior to federal control could have been brought against the carrier. It is not, therefore, a suit of the character that Congress consented might be brought against an agent appointed by the president.

Argued orally by *Wm. S. Bennett,* for appellants, and *T. J. Wills* and *Angus A. McLaughlin,* for appellee.

COOK, J., delivered the opinion of the court.

This is an appeal from the judgment of the circuit court of Forrest county sustaining a demurrer of the appellee to the amended declaration of the appellant. The material averments of the declaration are substantially as follows:

The organization of the appellant, the successor of the Edward Hines Yellow Pine Lumber Company, Wyatt Lumber Company, the Champion Lumber Company, and the Wolf River Lumber Company, is set forth, and the appellee is averred to be the present duly appointed Director General of Railroads and Agent of the President of the United States, who was appointed, prior to the commencement of this action, pursuant to an act of Congress, approved February 28, 1920, known as the Transportation Act of 1920 (Comp. St., section 10071¼ et seq.), and is still serving as such Director General of Railroads and Agent of the President; that, by virtue of said act of February 28, 1920, and his appointment, he is the official designated by law against whom suits and proceedings growing out of the administration of the railroads of the United States by the President of the United States under and by virtue of law during the war period, and up to March 1, 1920, shall be brought; and that this action is of the kind and character described in section 206 (a) of the Transportation Act (Comp. St., section 10071¼cc), as to which the appellee is the necessary and proper party defendant.

The declaration avers the execution of a contract, dated June 22, 1916, and two supplemental contracts, one dated July 15, 1916, and the other November 15, 1917, by and between the Gulf & Ship Island Railroad Company, a Mississippi railroad corporation, on the one hand, and Edward Hines, a citizen of Illinois, and the several lumber companies which afterwards were merged into the appellant trust estate, on the other hand; copies of such contracts being annexed as exhibits to the declaration.

Under the terms and provisions of these contracts, the railroad company undertook and obligated itself to complete and construct approximately twenty-five miles of standard gauge railroad, beginning on its main line at or near Hovey, Miss., and extending to a junction with the logging road of the Jordan River Lumber Company, and to begin the construction of the said railroad within thirty days, and to complete it ready and safe for use and occupation within a reasonable time by continuous work thereon with a reasonable force.

The said railroad company also agreed to build, construct, and install a good telephone system along the said twenty-five miles of railroad, and to string a first-class telephone line on poles on its right of way from Gulfport to Hovey, and there connect the same with the telephone system to be constructed along the line of this new railroad; also to construct, at is own cost and expense, all necessary sidings or side tracks for the assembling and delivery by the lumber company, and the receiving by the railroad of all logs and incoming and outgoing freight; also to build and construct all necessary and proper passing tracks; and to maintain a portion of the railroad and telephone system during the life of the contract, in a good and reasonably safe condition for the purposes of sawmills to be served at Klin, Lumberton, and a proposed mill at Gulfport; also to provide and maintain at its own cost and expense all necessary locomotives, and not less than one hundred five log cars for the Gulfport mill, and not less than fifty log cars for the kiln mill, and to use these cars in transporting and delivering the logs of the lumber company to the three mills.

It was also provided that the said railroad company should transport the incoming freight of the lumber companies from Hovey to the lumber company plants, and the outgoing freight of the lumber company from the point of receipt to Hovey, free from cost or expense to the lumber company, and should transport all logs from

the point received to the three mills for the sum of three dollars per car; and the railroad company also obligated itself to furnish and maintain, at its own cost and expense, cars and equipment which were necessary for the transportation of logs to the three mills, and, in addition to furnishing these cars, to furnish the cars necessary to log the Lumberton Mill, not less than one hundred ninety-five, and also to pay for reconditioning, maintaining, and operating seventy-seven ore cars, described in one of the contracts.

The lumber companies obligated themselves to furnish the necessary rights of way free of expense to the railroad company, and to provide the necessary cross-ties and bridge timber at a fixed cost, and to ship over the line of the said railroad company manufactured timber and lumber to the amount of not less than one billion feet, and all lumber manufactured by them in excess of that amount at the regular fixed tariff of freight charges, and also to ship over the lines of such railroad all other forest products from the lands of said lumber companies.

The railroad company agreed to conduct in its name all necessary condemnation proceedings for rights of way, the expense of any such proceeding to be paid by the lumber companies. There were many other provisions of these contracts which provided in great detail for the operations thereunder, and specified the mutual obligations in regard thereto which were assumed by the respective parties, but they are not material to a decision of the question involved. There was also attached to the declaration as an exhibit thereto a copy of a fourth contract, which merely substituted the present appellant as a party in interest in the previous contracts instead of the various lumber companies.

The declaration alleged that the said Gulf & Ship Island Railroad Company, in pursuance of said contracts, commenced the construction of said line of railroad, which by the terms of said contracts it had agreed to construct, and was in the process of such construction

when the Director General of Railroads took over the Gulf & Ship Island Railroad, along with other railroads, under the proclamation of the President of the United States; that under and by virtue of the authority of the act of Congress, and the proclamation of the President, the Director General began the operation of the Gulf & Ship Island Railroad.

The declaration further alleged that, because of such taking over by the President, the said Gulf & Ship Island Railroad Company was rendered unable to continue the carrying out of said contract, but that, after he took over the operation and control of said railroad, the Director General began to perform the contracts with appellants, and continued for a time the construction of the railroad therein provided for; the specific declaration upon this point being ''that, because of such taking over by the President, pursuant to the said statutes, the said Gulf & Ship Island Railroad was rendered unable to continue the said carrying out of said contract. For a time the said contracts were carried out by the said William G. McAdoo, as Director General of Railroads, but that subsequently and without cause the said William G. McAdoo, as Director General of Railroads, ceased the construction of the said railroad connecting with the logging road of the Jordan River Lumber Company, and otherwise ceased the carrying out of the said contracts of June 22, 1916, July 18, 1916, November 16, 1917, and February 9, 1918, and that their carrying out was never renewed prior to March 1, 1920.''

The declaration then averred that up to the time the Director General ceased the construction of the line of railroad, and abandoned the performance of the contracts, the appellants and its predecessors in interest had performed all acts and things required of them under the provisions of the several contracts, and were willing and able to continue to discharge all the obligations imposed upon them by the provisions of the contract, and that the failure and refusal of the Director

General of Railroads to continue the construction of the said railroad and to operate same, and to further perform the conditions of the said contracts, caused the appellants to suffer damages as alleged and specifically itemized in the declaration, amounting to the sum of one million thirty-two thousand one hundred sixty dollars and twenty-nine cents. To this declaration the appellee filed a demurrer on the grounds, among others, that the court was without jurisdiction to entertain the suit; that the suit is one against the United States government by and through its President and Agent, authorized by Congress to operate the railroads under federal control, and is for an alleged cause of action not authorized to be brought under section 206 of the Transportation Act of 1920; and that the declaration does not state a cause of action against the United States government for which it can be held liable. This demurrer was sustained, and the appellants having declined to plead further, final judgment was entered dismissing the suit, and from this judgment this appeal is prosecuted.

The question involved is whether the amended declaration states a cause of action of the character described and covered by section 206 (a) of the Transportation Act of 1920, for which a suit is authorized to be brought against an agent to be appointed by the President. Section 206 (a) of the Transportation Act of 1920 (Comp. St. Ann. Supp. 1923, section 10071¼cc) reads as follows:

"Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use or operation by the President of the railroad or system of transportation of any carrier . . . of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this act. Such actions, suits, or proceedings may, within the periods of limitation now

prescribed by state or federal statutes but not later than two years from the date of the passage of this act, be brought in any court which but for federal control would have had jurisdiction of the cause of action had it arisen against such carrier.''

Under the provisions of the Act of Congress of August 29, 1916, chapter 418, 39 Stat. 619, 645 (Comp. St., sections 1974a), the President took possession and control of the railroads by his Proclamation of December 26, 1917, 40 Stat. 1733 (Comp. St., sections 1974a), which contained a provision for suits against such carriers, with limitations upon the right of execution against that property, in the following language:

''Except with the prior written assent of said Director General, no attachment by *mesne* process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director General may, by general or special orders, otherwise determine.''

In 1918 Congress enacted the Federal Control Act, in which it was provided that suits might be brought against all carriers while under federal control; Section 10 of this act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, section 3115¾j), reading as follows:

''Sec. 10. That carriers while under federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made there-

to upon the ground that the carrier is an instrumentality or agency of the federal government. . . .''

Under the authority of the Federal Control Act of 1918, on October 28, 1918, the Director General of Railroads promulgated General Order No. 50, providing that thereafter all suits based on a contract binding upon the Director General, claims for death or injury to person, or for loss or damage to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of carriers by the said Director General of Railroads, should be brought only against the Director General; the language of order being as follows:

''Actions at law, suits in equity and proceedings in admiralty hereafter brought in any court, based on a contract binding upon the Director General of Railroads, claims for death or injury to person, or for loss and damage to property arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the director General of Railroads, which action, suit or proceeding, but for federal control might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise: Provided, however, that this order shall not apply to actions, suits or proceedings for the recovery of fines, penalties and forfeitures.''

From this review of the various provisions authorizing suits based on causes of action arising out of the possession, use, or operation by the President, of carriers, it will be noted that the limitations appearing in General Order No. 50, that the suit must be based on a contract binding on the Director General of Railroads, or a claim for death or injury to person, or for loss or damage to property, arising since December 31, 1917, are not contained in section 206 (a) of the Transportation Act of 1920, but in that section the language is more general, in that it is provided that actions at law, suits in equity, and proceedings in admiralty, based upon

causes of action arising out of the possession, use, or operation by the President of any carrier of such character as prior to federal control could have been brought against such carrier, may be brought, within the period of limitation, against the agent to be designated by the President for that purpose. While the language of the said section 206 (a) is broader than that of section 10 of the Federal Control Act, or of General Order No. 50, the latter act has been generally construed to authorize actions for all liabilities arising during the period of federal control and growing out of the possession, use, control, or operation of any carrier, and not to such only as arise out of the operations as a common carrier.

In the case of *New Jersey Shipbuilding & Dredging Co.* v. *Davis, Agent* (D. C.), 11 F. (2d) 994, it was held that General Order No. 50 "interpreted section 10 as authorizing suits against the Director General whenever such suits except for federal control might have been brought against the carrier company, suits for fines, penalties, or forfeitures alone being excepted. Liabilities recognized as enforceable by suit against the Director General were not limited to those arising out of his operations as a common carrier, but included all liabilities arising during the period of federal control and growing out of the possession, use, control or operation of any railroad or system of transportation."

In *Hines* v. *Sangstad S. S. Co.*, 266 F. 502, the circuit court of appeals in the First circuit held that "actions against carriers while under federal control, authorized by" section 10 of the Federal Control Act "are not limited to such as arise out of a breach of some duty imposed on defendant as a common carrier."

In discussing the purpose and effect of section 10 of the Federal Control Act, the supreme court of the United States, in the case of *Missouri Pacific R. Co.* v. *Ault*, 256 U. S. 554, 41 S. Ct. 593, 65 L. Ed. 1087, said:

"The plain purpose of the above provision was to preserve to the general public the rights and remedies

against common carriers which it enjoyed at the time the railroads were taken over by the President except in so far as such rights or remedies might interfere with the needs of federal operation. The provision applies equally to cases where suits against the carrier companies were pending in the courts on December 28, 1917; to cases where the cause of action arose before that date and the suit against the company was filed after it; and to cases where both cause of action and suit had arisen or might arise during federal operation. The government was to operate the carriers, but the usual immunity of the sovereign from legal liability was not to prevent the enforcement of liabilities ordinarily incident to the operation of carriers. The situation was analogous to that which would exist if there were a general receivership of each transportation system. Operation was to be continued as theretofore with the old personnel, subject to change by executive order. The courts were to go on entertaining suits and entering judgments under existing law, but the property in the hands of the President for war purposes was not to be disturbed. With that exception the substantial legal rights of persons having dealings with the carriers were not to be affected by the change of control.

"This purpose Congress accomplished by providing that 'carriers while under federal control' should remain subject to all then existing laws and liabilities and that they might sue and be sued as theretofore. Here the term 'carriers' was used as it is understood in common speech; meaning the transportation systems as distinguished from the corporations owning or operating them. . . . Thus, under section 10, if the cause of action arose prior to government control, suit might be instituted or continued to judgment against the company as though there had been no taking over by the government, save for the immunity of the physical property from levy and the power of the President to regulate suits in the public interest as by fixing the venue, or the time for

trial. If the cause of action arose while the government was operating the system the 'carrier while under federal control' was nevertheless to be liable and suable.''

In the case of *Wilson & Co.* v. *Davis, Director General of Railroads,* 8 F. (2d) 484, the circuit court of appeals in the Seventh circuit, after reviewing these statutes, said:

''A fair interpretation of these statutes, we think, demands a construction which continued (so far as possible) all existing rights, liabilities, and obligations of shippers and carriers.''

In *New Jersey Shipbuilding & Dredging Co.* v. *Davis, supra,* the court said:

''From this review it appears that, from the date of the original Proclamation of December 26, 1917, down to the passage of the Transportation Act of 1920, throughout the entire period of federal control, it was the consistent purpose of Congress and of the Executive to afford to all persons suffering loss and damage arising out of governmental operation and control the same right to sue therefor as if the properties had remained under private ownership and control.''

Again, in the case of *Davis* v. *Newton Coal Co.,* 267 U. S. 292, 45 S. Ct. 305, 69 L. Ed. 617, the court said:

''If the Philadelphia & Reading Railway Company or the Pennsylvania Railroad Company, while operating its own line, had seized and used the coal as the United States did while they operated those roads, the jurisdiction of the state court of actions to recover damages or compensation would be clear. And so, under the Transportation Act, that court properly entertained the proceedings now before us.''

In discussing these statutes, the district court, in the case of *Wyoming Sugar Co.* v. *Davis,* 7 F. (2d) 622, said:

''The act of Congress providing for federal control of railroads as a war-time measure (Act March 21, 1918, section 10, 40 Stat. 456 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, section 3115¾j]), provided that during said

control, in suits against a carrier, no defense should be interposed upon the ground that the carrier was an instrumentality of the federal government. The Transportation Act of 1920 created an agency by which controversies arising during federal control might be liquidated, and in our opinion carries with it in spirit the law providing for federal control, to-wit, that the agency of the government for this purpose should be amenable to the provisions of law applicable to common carriers.''

If federal control had not intervened, and the railroad company had breached this contract by a refusal to perform, as it is alleged was done by the Director General of Railroads, it would have undoubtedly been liable to the appellant for the damages flowing from such breach. The building of this short line of railroad according to the terms of the contract would have opened up a very large and presumably profitable field of business, and would have resulted in bringing to the railroad a vast amount of tonnage at the regular and current traffic rates. When the Director General took possession and control of this railroad, the obligations of this contract were in full force, and by performance thereof this vast increase of freight would have been brought to this railroad, and there would have been rendered quickly and readily available a very large amount of material necessary and suitable, and in great demand for the prosecution of the war activities.

We think it is clear that the Director General of Railroads had the right and authority to take over and adopt the contracts of the railroad company to build, construct, and operate the line of railroad provided for in the contracts, and for the purposes of this decision it may be conceded that no action would now lie against the Agent of the President if the Director General had declined to assume the obligations of the contract. The averment of the declaration in this case, however, is that the Director General, for a time, carried out the said contracts, and subsequently, and without cause, abandoned the same,

ceased the construction of the railroad, and otherwise ceased the carrying out of the said contracts; and, having the right and power to do so, when the Director General exercised that right and power, and assumed and took over the contracts, and began the construction of the said line of railroad, we think it then became his duty as such Director General to fully perform the said contracts, and, it being his duty to perform the contracts, he became liable for the damages resulting from his breach thereof. While the averments of the declaration as to the assumption of these contracts by the Director General and his acts in partial performance thereof are not as full as they might be, we think they are, upon this point, sufficient to withstand a demurrer, and that the demurrer should have been overruled and the defendant required to plead.

The appellee relies with great confidence upon the case of *Austin* v. *Hines,* 278 Pa. 537, 123 A. 502, but we do not think that the case militates against the view herein expressed. In that case, about twelve years before the taking over of its property by the government, the railroad company had begun a proposed change of its line, and had purchased numerous pieces of land along the proposed route, but there remained a number of properties on this proposed line that had not been purchased. Some disconnected construction work had been done on the proposed line, and on one of the pieces of property that had been purchased for the proposed line there was located an old building which had been sold to a third party, and by this third party partially demolished, leaving the walls unsupported. The walls of this building collapsed, killing a child, for which injury suit was brought against the Director General of Railroads. The opinion of the supreme court of Pennsylvania expressly states that no change in the line of railroad, and, up to February 23, 1919, no construction work of any character, had been done on this lot by the railroad company or the United States Railroad Administration. Other

than the fact that it might ultimately be used for transportation purposes, there was no evidence that the land was part of the system, or in any manner used by the United States, and it was held that under these facts the government had not assumed control of this line or the property located thereon, and consequently the Director General was not liable. This is altogether a different state of facts from those averred in the amended declaration in the case at bar, in which is pleaded the contracts, and that the Director General carried out these contracts for a time, including the construction of the said railroad to connect with the logging road of the Jordan River Lumber Company, and then, without cause, ceased the construction of said road, and otherwise ceased the carrying out of the said contracts.

The judgment of the court below sustaining the demurrer to the amended declaration will therefore be reversed, and the cause remanded.

*Reversed and remanded.*