DAVIS, DIRECTOR GENERAL OF RAILROADS, ETC., OPERATING PHILADELPHIA & READING RAILWAY, *v.* NEWTON COAL COMPANY.

DAVIS, DIRECTOR GENERAL OF RAILROADS, ETC., OPERATING PENNSYLVANIA RAILROAD, *v.* NEWTON COAL COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF PENN-SYLVANIA.

Nos. 709 and 710. Argued January 12, 1925.—Decided March 2, 1925.

1. While coal which plaintiff had purchased through contracts with producers was in course of transportation over railroads then under Federal Control, it was commandeered by the Director General of

Railroads, acting under orders of the Fuel Administrator, for use in operating the railroads, and he paid the producers the prices fixed by the Fuel Administrator, which were the same as the prices named in plaintiffs' contracts. *Held*

(*a*) That the plaintiff was entitled to be paid the difference between prices thus paid to its vendors and the market value, which was higher. P. 301.

(*b*) That by § 206 (a) of Transportation Act, 1920, actions therefor could be maintained in the state court against the agent designated by the President under that Act. P. 301.

281 Pa. St. 74, affirmed.

ERROR to a judgment of the Supreme Court of Pennsylvania affirming recoveries from the Director General of Railroads, as agent under the Transportation Act, 1920, on account of coal seized and appropriated for operating railroads while under Federal Control:

*Mr. Wm. Clarke Mason*, with whom *Mr. John Hampton Barnes* and *Mr. Charles Myers* were on the brief, for plaintiff in error.

At the time of the transactions, January and February, 1920, the war with Germany had not terminated and therefore any powers which the Government had incident to the war still remained. *Hamilton* v. *Kentucky Distilleries Co.*, 251 U. S. 146.

It must be assumed that all of the orders made by the President or his agents under § 25 of the Lever Act were made " for the efficient prosecution of the war " unless the contrary appears on the face of such orders. The orders here definitely show that they were made on account of the war emergency. All of the orders, both executive and those made by the Fuel Administration, refer to the Act of Congress of August 10th, 1917. The executive order of October 30th, 1919, states in its preamble ". . . whereas it is necessary to restore and maintain during the war certain of said rules, regulations, orders and proclamations . . ."

The Fuel Administration order of October 31st, 1919, states that it is made on account of the " present emergency " and it must be assumed that this means the war emergency.

It would be a most unwise policy to allow courts to enquire into the motives of the executive branch of the Government in making orders during the war emergency in order to determine their validity.

The state court in its opinion, however, said that the testimony showed that the Fuel Administrator in issuing the orders under consideration did not act on account of the war emergency but on account of the threatened coal strike and, therefore, the orders were invalid. Section 2 of the Lever Act provides " that in carrying out the purposes of this Act the President is authorized to create or use any agency or agencies." Congress delegated certain of its powers by this act to the President and the Fuel Administrator was the President's duly authorized agent in issuing orders, so that these orders were substantially the acts of Congress and, therefore, the first answer to the reasoning of the court below is that the court has enquired into the motive of Congress in determining the validity of the orders. The second answer is that there is no evidence to justify the finding that the orders were issued solely because of the coal strike, but on the contrary the evidence shows that the conditions existing because of the war emergency were made more alarming by the additional shortage due to the strike.

The conclusion of the State Supreme Court is in direct conflict with decisions of this Court. *Commercial Trust Co. v. Miller*, 262 U. S. 51.

The fact and date of the termination of the war had not been ascertained and proclaimed by the President in the manner fixed by Congress at the time the events under consideration took place, and this fact of termination was not ascertained and proclaimed until after the orders which are attacked in these cases were suspended.

The orders under consideration did not violate the Fifth Amendment by the method provided to fix compensation.

The question must be approached in the light of the facts, and the answer must take into consideration the identity of the divertee. The diversion was by the agency of the Fuel Administrator and the use of the diverted coal was by the Director General of Railroads, which were the first preferred consumers on the fuel administration list. If the railroads had been privately operated at the time of diversion this case would present substantially the facts found in *Morrisdale Coal Co.* v. *United States,* 259 U. S. 188, and the conclusions should be the same as there. If the fact of Government operation requires the diversion to be treated as a requisitioning under § 10 of the Lever Act for use by the United States of America, then a totally different case is developed. In the latter event the sole cause of action would seem to be under that section of the Lever Act, and the rule of *United States* v. *New River Collieries Co.,* 262 U. S. 341, would probably apply.

In several decisions of the lower federal courts the constitutionality of the Lever Act has been assumed, and there seems to have been but one federal decision which has discussed and adjudicated the constitutionality of the applicable sections of the Lever Act, *Ford* v. *U. S.* 281 Fed. 298. This Court reversed that decision (264 U. S. 239), but did so solely on the ground that the Lever Act did not apply to the coal involved. See *Lajoie* v. *Milliken, et al.,* 242 Mass. 508.

Congress is given certain powers in war time which even the Fifth Amendment does not limit or restrict. The power to restrict the liquor traffic is one, as stated in *Hamilton* v. *Kentucky Distilleries Co., supra,* at page 156, for the reason that this is an appropriate means of increasing war efficiency. Is not this war efficiency just as much affected by the use, distribution and price of coal?

The contracts between the Coal Company and the shippers, show that the Coal Company agreed that the coal to be shipped under the contracts would be subject to the regulations of the Fuel Administration, including of course the orders, such as those under consideration, to be thereafter issued. In the case of *Vogelstein* v. *United States,* 262 U. S. 337, this Court held that one who co-operated with others in putting into effect and maintaining a price established by the Government could not later recover a greater price, and the same reasoning would seem to apply to the claim of the defendant-in-error. *Morrisdale Coal Co.* v. *United States,* 259 U. S. 188.

The origin of the Fuel Administrator and the Federal Agent is in the federal statutes, and both are agencies of the President. One derived his powers, however, from the Lever Act and the other from the Transportation Act. There is no authority given to the Federal Agent under § 206 of the latter act to answer for the acts of the agencies of the Fuel Administration under § 10 of the Lever Act, or under the general power of condemnation of the Federal Government, but merely for those causes of action for which the carriers would have been otherwise liable.

The Director General as Federal Agent, plaintiff-in-error in these cases, admits his liability under the orders of the Fuel Administrator to pay the proper price for coal lawfully diverted to the Director General and lawfully used by the Director General in the operation of the railroads. He has assumed that the payment of the price fixed by the Fuel Administration discharged this liability; but if authority was lacking to fix such price, then for the coal lawfully diverted he is liable for such price as may be judicially determined.

The clear distinction which this Court has drawn between the several capacities in which the Director General functioned is found in *Dahn* v. *Davis,* 258 U. S. 421;

*Dupont* v. *Davis,* 264 U. S. 456; *North Carolina Ry. Co.* v. *Lee,* 260 U. S. 16; *Missouri R. R.* v. *Ault,* 256 U. S. 554; *Davis* v. *Donovan,* 265 U. S. 257; *Davis* v. *O'Hara,* 266 U. S. 314.

*Mr. Allen S. Olmsted,* 2d, with whom *Mr. Wm. A. Glasgow, Jr.,* was on the brief, for defendant in error.

The post-war fuel regulations of 1919–20 were not within the President's statutory power to regulate the distribution of coal " whenever in his judgment necessary for the efficient prosecution of the war."

The Government, having taken and used the coal, must pay its fair value, judicially determined.

Section 25 of the Lever Act, which gives the President power to fix prices, also provides that in fixing the prices, he shall cause a careful inquiry to be made into costs and other factors affecting the price. There is no pretense that such an inquiry was made here. The price paid by the divertee of this coal was fixed in a series of orders, of which the latest is dated May 24, 1918. The Government control of prices had been lifted on January 31, 1919, and there followed nine months of free trading. Suddenly on October 30, 1919, the President revived the 1918 prices. Current prices, as this record shows, and the trial court found, were far higher than the 1918 prices. Under such circumstances we submit that, even though the diversions were lawful, the 1918 prices were not binding, and therefore, even though the Director General were a private citizen, the payment of the 1918 price would not protect him in a suit by the owner of the coal.

But the Director General was not a private citizen. A suit against him " is an action against the United States." *Davis* v. *O'Hara,* 266 U. S. 314, and cases cited. *Corona Coal Co.* v. *United States,* 263 U. S. 527. Plaintiff-in-error stresses the dual capacity of the Director General. As Fuel Administrator he diverted the coal; as Railroad

Operator he received it. This is but another way of saying that the Government both took and used the coal. How much must it pay for it?

Even the plaintiff-in-error, in answering that question, concedes that the rule of *United States* v. *New River Collieries Co.* 262 U. S. 341, would probably apply. *National City Bank.* v. *United States,* 275 Fed. 855, s. c. 281 Fed. 754, 263 U. S. 726; *Vogelstein* v. *United States,* 262 U. S. 337.

This suit was properly brought against the Director General under § 206a of the Transportation Act, 1920.

If the orders were invalid, the taking was wrongful and all who participated in the transactions were trespassers in their own wrong. That the Director General is liable for torts committed by railroad employees is well settled. *Missouri Pacific R. Co.* v. *Ault* 256 U. S. 554; *Director General* v. *Kastenbaum,* 263 U. S. 25.

If the taking be assumed to be lawful, the Director General is none the less liable. In the pleadings he admits he is the proper defendant and counsel reiterates that admission.

These suits come exactly within the language of the statute. The cause of action arises out of Federal Control. It is of such character as prior to Federal Control could have been brought against a corporate carrier; for surely an action lies against a corporation to recover the value of property to which it has rightfully obtained title, e. g., by eminent domain, or under contract.

It is, we submit, irrelevant that an action would also lie against the United States *eo nomine,* under § 10 of the Lever Act.

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

These causes present the same points of law and were heard together both here and below. No disputed question of fact remains. In 1919 defendant in error, a

Pennsylvania corporation, doing business at Philadelphia, contracted with producers for large quantities of bituminous coal, f. o. b. the mines, subject to the regulations of the United States Fuel Administration. During January and February, 1920, while thirty-three cars of coal consigned to the corporation under these contracts were moving over the Philadelphia & Reading Railway, the Director General of Railroads took possession of them and used the fuel for operating trains on that line. Eighty cars loaded with the same character of coal and moving on the Pennsylvania Railroad were similarly treated. The claim is that the Director General took this action under lawful rules and orders of the President, acting through the Fuel Administrator and pursuant to the Lever Act, approved August 10, 1917, c. 53, 40 Stat. 276, 279, 284. The producers of the coal were paid the prices specified in the contracts of purchase, as required by the Fuel Administrator; and it is now maintained that nothing more can be demanded by the owner. The owner's claim is for the difference between the amount received by producers and the market value of the coal—approximately $1.44 per ton.

The Lever Act conferred upon the President certain powers to regulate the prices and distribution of fuel, to be exercised for the efficient prosecution of the war. August 23, 1917, he delegated these powers to a Fuel Administrator, who freely used them during the continuation of hostilities. Shortly after the armistice substantially all such regulations were suspended and the Administrator ceased to function; but his appointment was not canceled or revoked.

On October 30, 1919, the President undertook to restore former orders and to empower the Fuel Administrator, as occasion might arise, to change or make regulations relative to the sale, shipment and apportionment of bituminous coal as the latter might think necessary. The next

day the Administrator delegated to the Director General of Railroads the power to divert coal upon the railroads as might seem "necessary in the present emergency to provide for the requirements of the country." March 19, 1920, the President suspended all fuel regulations.

Seeking to recover the difference between the amounts paid to the shipper—the purchase price—and the market value of the coal, defendant in error commenced these proceedings (June, 1921), in a state court at Philadelphia, against the Agent appointed by the President under the Transportation Act, 1920, c. 91, 41 Stat. 456, 461. Judgments went for it and were affirmed by the Supreme Court. 281 Pa. 74. The latter court held: That the war with Germany had ceased prior to October 30, 1919, and the purpose of the President's order then issued was to meet an emergency incident to the miners' strike—not to provide for the efficient prosecution of the war. Also that seizure and use of the coal by the Director General rendered the United States liable for just compensation, measured by market value. And, further, that the Director General was not an innocent third person to whom property has been delivered by the sovereign for the public welfare, but an agency of the United States for operating the railroads, and, under the Transportation Act, 1920, plaintiff in error might be sued upon claims arising therefrom.

The plaintiff in error now insists: That the order of October 30, 1919, and the regulations issued by the Fuel Administrator and the Director General of Railroads acting thereunder, were authorized by the Lever Act. That by diverting the coal to himself the Director General incurred no obligation except to pay the amounts due the shippers under the sale contracts—the compensation fixed by the orders. That the act of the Director General in diverting the coal to himself and its use on the railroads imposed no liability for which an action can be main-

tained against the Agent provided for by the Transportation Act.

From the facts stated it appears, plainly enough, that one hundred and thirteen cars of coal belonging to defendant in error were seized by the United States while upon the lines of carriers under their control and thereafter appropriated and used in the operation of such roads. The taking was for a public use. The incantation pronounced at the time is not of controlling importance; our primary concern is with the accomplishment. As announced in *United States* v. *New River Collieries Co.*, 262 U. S. 341, 343, 344, " where private property is taken for public use, and there is a market price prevailing at the time and place of the taking, that price is just compensation " to which the owner is entitled. Also, " the ascertainment of compensation is a judicial function, and no power exists in any other department of the Government to declare what the compensation shall be or to prescribe any binding rule in that regard."

Transportation Act, 1920, § 206(a)—

"Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the Act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this Act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this Act, be brought in any court which but for Federal control would have had jurisdiction of the cause of action had it arisen against such carrier."

If the Philadelphia & Reading Railway Company or the Pennsylvania Railroad Company, while operating its own line, had seized and used the coal as the United States did while they operated those roads, the jurisdiction of the state court of actions to recover damages or compensation would be clear. And so, under the Transportation Act, that court properly entertained the proceedings now before us.

*Affirmed.*