HOOD RUBBER COMPANY *vs.* DIRECTOR GENERAL OF RAILROADS.

Suffolk.   December 8, 1925. — March 1, 1926.

Present: RUGG, C.J., BRALEY, PIERCE, WAIT, & SANDERSON, JJ.

*Director General of Railroads. Fuel Commissioner. Lever Act.*

Executive orders by the President of the United States, issued on October 30, November 5 and November 12, 1919, and purporting to revise orders formerly issued during the World War under the provisions of the Lever Act, 40 U. S. Sts. at Large, 276, were without warrant in law and furnished no defence to an action against the Director General of Railroads under the Transportation Act, 41 U. S. Sts. at Large, 461, by the owner and consignee of coal which was delivered to the defendant between October 30, 1919, and February 16, 1920, and was confiscated by him under authority which he assumed was conferred upon him by such orders.

In an action of the character above described, it is immaterial by what agency the coal seized by the defendant was used.

CONTRACT OR TORT for the ·value of coal sold to the plaintiff, f.o.b. mines in Pennsylvania, and there for transportation delivered to the defendant, then operating the Pennsylvania Railroad system, by whom it was confiscated. Writ dated February 25, 1922.

In the Superior Court the action was heard by *Sisk*, J., without a jury, upon an agreed statement of facts and an agreed statement as to testimony. Material evidence and exceptions saved by the defendant are described in the opinion. The judge found for the plaintiff in the sum of $5,714.61. The defendant alleged exceptions.

*H. F. Knight*, for the defendant.

*H. E. Warner*, for the plaintiff.

PIERCE, J. This is an action of contract or tort brought against James C. Davis, Director General of Railroads, and Agent, to recover compensation for thirteen carloads of coal which were confiscated by the director general between October 31, 1919, and March 1, 1920, while the coal was in transit on the lines of the Pennsylvania Railroad in the State of Pennsylvania, then under Federal control, and consigned to and *en route* to the factory of the plaintiff at Union Market, Watertown, Massachusetts. The case was tried, without a jury, upon an agreed statement of facts and an agreed statement as to testimony, before a judge of the Superior Court who found for the plaintiff in the sum of $5,714.61, based on agreed damages at $8 a ton. The case is before this court on the defendant's exceptions (a) to the judge's refusal of his motions for judgment, (b) to the judge's refusal of his requests for rulings, (c) to the judge's granting the plaintiff's requests for rulings, and (d) to the judge's finding for the plaintiff.

Succinctly stated the facts shown by the agreed facts and agreed testimony are as follows: The coal had been purchased by the plaintiff under a written contract in April, 1919, deliverable f. o. b. mines. On various dates from October 30, 1919, until February 16, 1920, inclusive, coal was delivered by the seller under the contract to and was accepted by the defendant, in operation of the Pennsylvania Railroad, for shipment and delivery to the plaintiff at the Union Market station, referred to above. This coal never reached Union Market and no part of it was in fact delivered to the plaintiff or on its order. While on the Pennsylvania Railroad lines it was seized, and all but two cars of it was used by the defendant in operating the Pennsylvania Rail-

road.   The remaining two carloads the defendant diverted to the Philadelphia and Reading Railroad (in operation by the Director General) and were delivered to and actually used by a private consumer, the Reading Iron Company.

Under the Lever Act (approved August 10, 1917; 40 U. S. Sts. at Large, 276), the President of the United States delegated certain powers to regulate the price and distribution of fuel to a fuel administrator.   The fuel administrator on December 24, 1917, issued an order, effective December 29, 1917, "Regulating the making of contracts by operators, producers, and jobbers of coal and coke."   On January 17, 1919, this order was vacated and set aside, and a new order was promulgated, effective January 18, 1919.   The order of January 17, 1919, retained in substance the provision of the order of December 24, 1917, to the effect that "Every contract for the sale of coal . . . shall provide that the price of each shipment of coal . . . made thereunder shall not exceed the price at the mine . . . as established by the President or by the United States Fuel Administrator."   It also contained the provision (2) that "Every such contract shall provide that the same shall be forthwith canceled and of no further binding effect upon either party thereto, upon receipt of a request or an order from the United States Fuel Administrator for such cancellation, and that in case of such cancellation neither party to the contract shall be under any further liability to the other thereunder and that neither shall have any claim against the United States by reason of such contract or the cancellation thereof"; and the further provision (3) that "Every such contract shall provide that coal . . . deliverable thereunder shall be subject to requisition by the United States Fuel Administrator or his representatives, including under the term 'requisition' the right to divert such coal . . . to any other party than the purchaser named in the contract; that such requisition may be made at any time during the continuance of the contract and prior to actual receipt and unloading of the coal . . . so requisitioned, at the point of ultimate destination by the person entitled thereto under the terms of the contract."

The order of January 14, 1918, "Relative to the price to

be paid for coal by the divertee in case of diversion" was suspended under the order of January 31, 1919. In October, 1919, a nation wide coal strike was threatened, and, on October 30, 1919, the President, under the authority conferred upon him by the Act of Congress (40 U. S. Sts. at Large, 276) revoked the order of the fuel administrator of January 31, 1919, in so far as it suspended the order of January 14, 1918, and restored the order of January 14, 1918, and an order of May 25, 1918, to take effect as if they had not been suspended, and designated "the Director General of Railroads and his representatives to carry into effect the said order of January 14, 1918, and to make such diversions of coal which the railroads under his direction may as common carriers have in their possession, as may be necessary in the present emergency to provide for the requirements of the country in the order of priority set out in the preference list included in the order of the United States Fuel Administrator of May 25, 1918"; here follows a preferential list: "Railroads . . . ." The transfer of authority to the director general of railroads was made under the Overman Act; May 20, 1918, c. 78; 40 U. S. Sts. at Large, 556.

A further executive order, issued November 5, 1919, in substance the same as the one of October 30, 1919, reciting the revocation of the orders of January 31, 1919, and of February 20, 1919, stated that "it may become necessary to restore and maintain during the war certain other of the said rules, regulations, orders and proclamations . . . [and ordered and directed] that the United States Fuel Administrator shall, as occasion may require, restore, change or make such rules, regulations, orders and proclamations fixing the prices or . . . distribution . . . or use, of all coal . . . as in his judgment may be necessary." November 12, 1919, the United States fuel administrator, so far as prices were concerned, eliminated from the order dated October 30, 1919, *bona fide* contracts enforceable at law relating to bituminous coal, entered into prior to October 30, 1919.

The defendant's exceptions are based upon the theory that the confiscation of the coal was by the United States fuel administrator; and that the orders and regulations of the

said administrator under the Overman Act, 40 U. S. Sts. at Large, 556, make out a defence to this action. As put by the defendant, the action, if maintainable at all, is maintainable against the United States, *eo nomine*, in the United States District Court, 40 U. S. Sts. at Large, 279, § 10.

The plaintiff contends that the Federal control of the railroads-had terminated and the pending action was brought rightly under the Transportation Act, 1920, § 206 (a), 41 U. S. Sts. at Large, 461, which reads: "Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use, or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the Act of August 29, 1916) of such character as prior to Federal control could have been brought against such carrier, may, after the termination of Federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this Act. Such actions, suits, or proceedings may, within the periods of limitation now prescribed by State or Federal statutes but not later than two years from the date of the passage of this Act, be brought in any court which but for Federal control would have had jurisdiction of the cause of action had it arisen against such carrier."

The defendant is an agent, duly designated by the President under and pursuant to § 206 of the Transportation Act of 1920; 41 U. S. Sts. at Large, 461; 40 U. S. Sts. at Large, 556. Aside from the war powers conferred upon the President for the national security and defence, 40 U. S. Sts. at Large, 276, 284, c. 53, §§ 2, 25, the defendant, as a common carrier, would be liable to the plaintiff for any loss it sustained through the defendant's conversion or failure to deliver the carloads of coal which it had received to deliver to the plaintiff. *Weiss* v. *Director General of Railroads*, 250 Mass. 12, 20. *Missouri Pacific Railroad* v. *Ault*, 256 U. S. 554. *Aetna Mills* v. *Director General of Railroads*, 242 Mass. 255.

The Lever Act conferred upon the President certain

powers to regulate the prices and distribution of fuel, to be exercised for the efficient prosecution of the war. Under § 25 of the act, the restoration order of October 30, 1919, could be issued only if a state of war continued, and the order was issued as a war measure. On January 31, 1919, shortly after the armistice, substantially all regulations as to prices and distribution of coal were suspended and the administrator ceased to function. The restoration of the former order on October 30, 1919, in anticipation of a strike in both hard and soft coal mines, and the delegation of power to the Director General of Railroads to divert coal upon the railroads as might seem necessary in the then present emergency to provide for the requirements of the country, were not in any way connected with the war; they affected but a part of the community, and the use of a commodity which the government has not attempted to regulate. The executive orders of the President issued October 30, November 5, and November 12, 1919, were not within the power conferred upon the President by the Lever Act. 40 U. S. Sts. at Large, 276, 284, c. 53, §§ 2, 25.

The case at bar in every material particular is on all fours with *Davis* v. *Newton Coal Co.* 267 U. S. 292, which came to the Supreme Court on error to a judgment of the Supreme Court of Pennsylvania, *Newton Coal Co.* v. *Davis*, 281 Penn. St. 74. The defendant in this regard contends that the rules and regulations concerned in this case and above set out were not relied on at the trial of the *Newton* case, and that therefore that case has no controlling value in the determination of this case. A careful study of the case as it is reported in volume 281 of the Pennsylvania reports, and briefs of counsel, and of the same case with briefs of counsel as reported in volume 267 of the United States Supreme Court Reports, makes it impossible to assume that the United States Supreme Court did not consider the rules and regulations of the fuel administrator above quoted and relied on by the defendant.

We are of opinion that the fact that the railroad was under Federal control does not alter the situation. While the Federal control lasted, the plaintiff could have sued the

Director General of Railroads for the loss of the coal, under the act of March 21, 1918, c. 25; 40 U. S. Sts. at Large, 451, and General Order No. 50. After Federal control ceased the plaintiff could have sued the agent designated by the President under § 206 (b) of the Transportation Act of February 28, 1920, c. 91, 41 U. S. Sts. at Large, 461. *United States* v. *McNeil & Sons,* 267 U. S. 302. *Davis* v. *Newton Coal Co., supra. Corona Coal Co.* v. *United States,* 263 U. S. 537, 539. It is entirely immaterial whether the coal seized by the defendant was used by the Pennsylvania Railroad, or by some other railroad or corporation, by the order of the defendant. The legal right of the plaintiff in either case was invaded by the acts of the defendant, and it should have a remedy for any loss it has sustained by reason of such wrong.

*Exceptions overruled.*