**MELLON, Director General of Railroads, v. WESTON DODSON & CO., Inc.**

Circuit Court of Appeals, First Circuit. July 8, 1927.

No. 2122.

1. **Railroads** ⊚⇒5½(45)—**Suit for difference between market value and price paid for coal requisitioned for use of railroad held properly brought against Director General (Transportation Act of 1920, § 206, subd. [a], being Comp. St. § 10071¼cc; Lever Act, § 10 [Comp. St. § 3115⅛ii]).**

Suit to recover for difference between market value and price paid for coal requisitioned by Director General for use of railroad *held* properly brought against Director General of Railroads under Transportation Act 1920, § 206 (a), being Comp. St. § 10071¼cc, and not against the United States, under Lever Act, § 10 (Comp. St. § 3115⅛ii), since the action was one arising out of operation by president of the railroad system under the Federal Control Act (40 Stat. 451, as amended).

2. **Railroads** ⊚⇒5½(40)—**Director General held liable for difference between price paid and market value of coal seized, but not delivered prior to termination of federal control.**

Where seizure of cargoes of coal by Director General for use of railroads was prior to termination of federal control and operation, Director General of Railroads was liable for difference between market price and that paid, notwithstanding delivery was not made until after federal control had come to an end.

3. **Railroads** ⊚⇒5½(40)—**Action cannot be maintained against Director General for difference between market value and price paid for coal sequestered and diverted when railroad was under private control (Transportation Act 1920, § 206 [a], being Comp. St. § 10071¼cc).**

Where railroad, at time of sequestration and diversion of coal by an instrumentality of the government for the equitable distribution of fuel coal under emergency, was under private control, an action cannot be maintained against Director General of Railroads under Transportation Act 1920, § 206 (a), being Comp. St. § 10071¼cc, for the difference between market value and price paid therefor.

4. **Railroads** ⊚⇒5½(42)—**Whether there was market value of coal requisitioned by Director General held for jury (Transportation Act of 1920, § 206 [a], being Comp. St. § 10071¼cc).**

In action under Transportation Act 1920, § 206 (a), being Comp. St. § 10071¼cc, against Director General of Railroads, as Agent, to recover difference between market value and price paid for coal requisitioned for use of railroad, question of whether or not there was a market value of coal at place and at time of sequestration was a matter of fact for jury.

5. **Railroads** ⊚⇒5½(48)—**Evidence held to sustain finding that owner of coal requisitioned by Director General did not accept sums received in full payment (Transportation Act 1920, § 206 [a], being Comp. St. § 10071¼cc).**

In action under Transportation Act 1920, § 206 (a), being Comp. St. § 10071¼cc, against Director General of Railroads, for difference between market value and price paid for coal requisitioned for use of railroad, evidence *held* to sustain finding that plaintiff did not accept sums which it received therefor in full payment.

In Error to the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Action by Weston Dodson & Co., Inc., against James C. Davis, Director General of Railroads, for whom Andrew W. Mellon was afterwards substituted. Judgment for plaintiff, and defendant brings error. Modified, and, as modified, affirmed.

John E. Walker, of New York City (Evan Shelby, of New York City, and George E. Kimball, of Boston, Mass., on the brief), for plaintiff in error.

James F. Curtis, of New York City (Julian Codman, of Boston, Mass., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. This was an action brought under section 206 (a) of the

Transportation Act of 1920 (Comp. St. § 10071¼cc) against the Director General of Railroads, as the agent designated for that purpose, to recover the difference between the market value and the price paid the plaintiff for coal requisitioned by the Director General of Railroads for the use of the Boston & Maine Railroad. Six cargoes of coal with a gross tonnage of 7,441.06 tons were requisitioned and diverted at Hampton Roads, Va., by agencies through which the Director General of Railroads acted during the months of December, 1919, and January, 1920, and shipped to Boston for the use of the Boston & Maine Railroad, then under federal control. For these cargoes the plaintiff was paid by the Director General of Railroads $34,910.70. During the month of February, 1920, two cargoes of coal, of a gross tonnage of 2,460.15 tons, were requisitioned and diverted by the same agencies and shipped to Boston for the use of the same railroad, and the railroad paid $11,868.63 for the same. These cargoes were loaded, one at Sewell's Point, Va., February 20, 1920; the other at Newport News, Va., February 25, 1920. The first was unloaded at Boston on March 2, 1920; the other on March 6, 1920. Another cargo was requisitioned and diverted March 9, 1920, by the Tidewater Coal Exchange, and unloaded at Boston March 20, 1920, and delivered to the same railroad. Its tonnage was 998.01 tons, and $4,862.50 was paid for it by a sight draft on the railroad. The other two cargoes which were delivered to the railroad after March 1, 1920, were paid for by the railroad, but from federal funds in its possession as trustee. The United States Railroad Administration was credited with these payments.

In its declaration the plaintiff seeks to recover the difference between the amount paid it and the market value of this coal at the times and places of seizure. The suit was originally brought against James C. Davis, Director General of Railroads, as the agent designated by the President of the United States under the Transportation Act of 1920. Andrew W. Mellon was afterwards substituted for James C. Davis and filed an answer as defendant. The action was tried before a jury in the District Court, who found specially that the fair market value of the coal requisitioned both before and after March 1, 1920, was $7.75 per ton; also that the plaintiff did not accept the sums which it received in full payment for the coal mentioned in the bills on which the payments were made. By a general verdict they found

that the plaintiff should recover as damages on the cargoes of coal unloaded at Boston before March 1, 1920, $7,875.05, with interest amounting to $3,320.90, and on three cargoes unloaded at Boston after March 1, 1920, the sum of $3,158.12 and interest, amounting to $1,301.14, a total of $15,655.-21, for which judgment was entered.

The defendant's contentions, which are raised by his assignments of error, are (1) that this suit is improperly brought against the defendant as Director General of Railroads and Agent, and that it is maintainable, if at all, only against the United States for just compensation under section 10 of the Lever Act (Comp. St. § 3115⅛ii); (2) that if the action can be maintained in regard to coal actually received in Boston prior to March 1, 1920, and used in the federal operation of the Boston & Maine Railroad, it cannot be maintained as to coal received in Boston after March 1, 1920, by the Boston & Maine Railroad, and used in the private operation of that system after the end of federal control; (3) that by reason of the embargo against the export of coal to foreign countries, except on special permit, which prevailed at Hampton Roads in December, 1919, and January, 1920, there was no free and open market for export coal. These contentions in substance were raised by the exceptions of the defendant and by its assignments of error.

[1] The defendant's first contention is ruled by Davis v. Newton Coal Co., 267 U. S. 292, 45 S. Ct. 305, 69 L. Ed. 617. Under an executive order the President, August 23, 1917, appointed a United States Fuel Administrator and authorized him to employ such assistants and subordinates as from time to time he deemed necessary, and provided also that all departments and established agencies of the government should co-operate with the United States Fuel Administrator in the performance of his duties as set forth therein. On October 30, 1919, the President authorized the Fuel Administrator, as occasion might arise, to make regulations relative to the sale, shipment, and apportionment of bituminous coal. Acting under the authority conferred upon him, the United States Fuel Administrator designated the Director General of Railroads and his representatives "to make such diversions of coal which the railroads under his direction may as common carriers have in their possession, as may be necessary in the present emergency to provide for the requirements of the country in order of priority set out

in the preference list included in the order of the United States Fuel Administrator of May 25, 1918." Then follows the preference list, headed by "railroads." Under this designation the Director General of Railroads, through different committees, undertook the distribution and diversion of coal in the possession of railroads as common carriers for use as fuel upon the railroads under federal control. He was not acting as agent of the United States Fuel Administrator, but in his capacity as Director General of Railroads. This authority was delegated to him because his office afforded him the opportunity of knowing the needs of the railroads and of making a more equitable and efficient distribution of the coal supply to them than could be done by the Fuel Administrator. Under the executive order appointing the Fuel Administrator all departments and agencies of the government were directed to co-operate with the United States Fuel Administrator, and by virtue of this provision, as well as his designation by the United States Fuel Administrator, the Director General of Railroads undertook the work of supplying the different railroads under federal control with coal needed by them for fuel purposes. The use was a public one, and under an emergency which had arisen it is not contended that the United States, in the exercise of its sovereign power, did not have authority to seize such a necessary commodity as fuel coal for railroads. There is no merit in the contention of the defendant that the suit should have been brought against the United States under section 10 of the Lever Act. The Transportation Act of 1920 (41 Stat. 456, § 206 [a]), is in part as follows:

"Actions at law, suits in equity and proceedings in admiralty, based on causes of action arising out of the possession, use or operation by the President of the railroad or system of transportation of any carrier (under the provisions of the Federal Control Act, or of the Act of August 29, 1916), of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an agent designated by the President for such purpose, which agent shall be designated by the President within thirty days after the passage of this act."

This was an action arising out of the operation by the President of a railroad system under the Federal Control Act (40 Stat. 451, as amended), and was properly brought against the Director General of Railroads, the agent designated by the President. Stripped of all technicalities, the action against him is one against the United States. Davis v. O'Hara, 266 U. S. 314, 45 S. Ct. 104, 69 L. Ed. 303, and cases cited. It is not in dispute that the Director General of Railroads was designated as the agent against whom suit might be brought.

[2] The defendant strenuously contends that no damages could be awarded as additional compensation for the seizure of the last three cargoes, two of which were seized in February and one in March, 1920, but not delivered to the Boston & Maine Railroad until after federal control of railroads had come to an end at midnight February 29, 1920. By executive order, February 28, 1920, the President ordered and directed that "the Director General of Railroads and his representatives shall continue after 12:01 o'clock a. m. on the first day of March, 1920, to have and exercise the powers conferred upon him by the orders of the United States Fuel Administrator dated October 31, 1919, and December 8, 1919." The two cargoes seized in February, 1920, before federal control had ceased, had been diverted by the Director General of Railroads to be used by the Boston & Maine Railroad, and were paid for by the railroad from federal funds in its possession as trustee. The seizure and diversion had taken place prior to the termination of federal control and operation, and the Boston & Maine Railroad was then in the possession of the President, and was being used and operated by him. As to these cargoes, the Director General of Railroads was liable for the additional amount necessary, in the opinion of the jury, to afford the plaintiff just compensation.

[3] The last cargo of coal, of a gross tonnage of 998.01 tons, was not sequestered and diverted, however, until March 9, 1920, and was not unloaded in Boston until March 20, 1920. A draft for $4,862.50 was paid by the Boston & Maine Railroad Company. The railroad was under private control at the date of the sequestration and diversion, and under section 206 (a) of the Transportation Act this action cannot be maintained as to that, as its cause did not arise from the possession, use, or operation of the Boston & Maine Railroad by the President. It does not appear from the record that the Director General of Railroads seized and diverted this cargo of coal, but that it was sequestered and diverted by the Tidewater Coal Exchange, an instrumentality of the govern-

ment for the equitable distribution of fuel coal under the emergency which had arisen. The tonnage of this last cargo of coal was 998.01 tons. The additional damages, which by their verdict the jury awarded to the plaintiff for the taking of the last three cargoes, was $3,158.12, and interest amounting to $1,301.14. The total tonnage of the last three cargoes was 3,458.16 tons. The additional damages upon these three cargoes was at the rate of 91⅓ cents per ton. It was stipulated by counsel that the coal of the three cargoes was of the same value. As the last cargo contained 998.01 tons, the damages that were awarded on account of it at 91⅓ cents per ton were $911.52, and the interest upon this from the time of its seizure to the date of the verdict would be $382.84, making a total of $1,294.36 awarded because of the taking of this last cargo of coal, for which there was no basis for an action brought under section 206 (a) of the Transportation Act.

[4] Whether or not there was a market value of coal at Hampton Roads at the times of sequestration was a matter of fact to be determined by the jury under the instructions given, which were as follows:

"And the question for you to decide is, 'What was the highest fair market value that could really have been obtained for this coal by this plaintiff at the time the coal was taken?' The government says, 'Well, you couldn't have exported it without a license.' And that is perfectly true. And they say, 'Without a license it is coal that could only be traded in in this country at the price fixed for this country; and it was not coal that could have been sold or delivered for export because no coal could be sold or delivered for export except with a permit and, non constat, no permit might have been granted.' How does the embargo against export affect you in dealing with the question of values? Not in any technical way. It is one element that is to be considered in deciding the question which is at the bottom of the case. The owner was entitled to what he lost by the taking of this coal, in dollars and cents. There was the coal. What would the man have got out of it? What could he have got out of it, using it the best way he could, or the best way he could have sold it to be used if it had not been taken? How much a ton? That is a pure question of fact, which you gentlemen must answer."

There was testimony that the coal for which the plaintiff was seeking compensation had been sent to Hampton Roads for sale in the export trade and that the plaintiff maintained a foreign representative in Europe and had a consistent constant demand for its coal and that the demand for coal for export of the quality seized during the months of December, 1919, and January, February, and March, 1920, was very strong and the regular price obtained in those months ranged between $8.25 and $10 per ton, dependent upon the ability of the exporter to obtain advantageous charters. In United States v. New River Collieries Co., 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014, the court said, in discussing damages to which the owner was entitled for coal requisitioned at Hampton Roads between September 17, 1919, and February 1, 1921, covering the months in which the coal of the plaintiff was requisitioned: "The owner was entitled to what it lost by the taking. That loss is measured by the money equivalent of the coal requisitioned. It is shown by the evidence that every day representatives of foreign firms were purchasing, or trying to purchase, export coal. Transactions were numerous and large quantities were sold. Export prices for spot coal were controlled by the supply and demand. These facts indicate a free market. The owner had a right to sell in that market, and it is clear that it could have obtained the prices there prevailing for export coal." There was evidence that during the months of January and February, 1920, the plaintiff did obtain permits for the export of coal to foreign countries by five vessels. There was evidence that would warrant the jury in finding that permits for the export of coal to foreign countries could be obtained under certain conditions, and under the instructions given by the court it was a question of fact to be found by the jury what, under all the conditions which prevailed—the government restrictions against export, and the conditions upon which permits would be granted for export —the fair market price of coal was at the times of the seizure of the plaintiff's coal. The jury have found, by their special verdict, that this was $7.75 per ton, and there was competent evidence to support this finding.

[5] The jury by special verdict have also found that the plaintiff did not accept the sums which it received in full payment. The record discloses that when bills were rendered by the plaintiff it added to the cost of the coal at the mines a profit upon each ton but that item of profit was stricken out and a voucher returned for the plaintiff's signa-

ture covering the cost only. Upon each bill which the plaintiff submitted there was this notation: "This coal is billed without prejudice to our rights in case consignee refuses to accept billing as rendered. We will accept payment on account without prejudice to your rights or ours"—thus leaving unsettled the question of what future payments should be made in addition to the cost of the coal at the mines which had been determined by the government agencies to be the amount to which the plaintiff was entitled. This, we think, was sufficient evidence to sustain this finding of the jury.

The judgment of the District Court is modified, by deducting therefrom the amount of damages and interest, totaling $1,294.36, awarded on account of the last cargo of coal seized and diverted after March 1, 1920, and, so modified, it is affirmed.