**ARCHIBALD McNEIL & SONS CO., Inc., v. UNITED STATES (two cases).**

District Court, E. D. Pennsylvania. December 15, 1927.

Nos. 10898, 10900.

War ⟨⟐⟩14—Shipper of coal, diverted by government as war measure, held limited in action for compensation to nominal damages by acceptance of settlement.

The United States, in the exercise of the power of eminent domain, diverted to others than the consignees coal shipped by plaintiff, a dealer, under contracts of sale. The government refused to pay for the coal, and plaintiff billed it to the divertees at a fair price, who also refused to pay, but offered to pay a smaller price in full settlement, which plaintiff was compelled to accept or suspend its business. *Held*, that such acceptance was not through legal duress, and, though it did not preclude a suit against the government for just compensation, it limited recovery therein to nominal damages.

At Law. Actions by the Archibald McNeil & Sons Company, Inc., against the United States. On hearing to the court on waiver of jury trial. Judgments for plaintiff for nominal damages.

See, also, 1 F.(2d) 39.

George Demming, of Philadelphia, Pa., for plaintiff.

Howard Ameli, Asst. Atty. Gen., Mark Thatcher, Asst. U. S. Atty., of Perkasie, Pa., and George W. Coles, U. S. Atty., of Philadelphia, Pa., for the United States.

DICKINSON, District Judge. These two cases were tried together and may be disposed of by one ruling.

Conclusion.

The conclusion reached is that the plaintiffs can recover no more than a nominal sum.

Fact Findings.

The general fact findings made in the course of the discussion present adequately the whole case and defense, but leave is granted to either party to present requests for fact findings and conclusions of law, which, if presented, will be later answered and incorporated herewith.

Discussion.

The plaintiffs were extensive dealers in coal, but were not miners. Coal shipments made in fulfillment of contracts entered into by them were, for public purposes, diverted by the United States to users other than the consignees, without the consent of the plaintiffs as owners of the coal, and without payment for the coal thus taken.

Theory of the Case.

The plaintiffs' theory of their case is that, their private property having been thus taken for public use, they have a constitutionally conferred right to "just compensation" therefor, and hence a cause of action.

The Defenses.

The defense is fourfold:

(1) This court has no jurisdiction to determine the cause.

(2) The coal had not been "taken," but merely "diverted" from its destined course of travel, and hence the plaintiffs have no cause of action, as what was done was that contemplated by the twenty-fifth section of the Lever Act (Comp. St. § 3115⅛q), not the tenth section (Comp. St. § 3115⅛ii).

(3) The plaintiffs have at the most an alternative cause of action. One is against the United States; the other against the divertees. Either might be asserted at the election or option of the plaintiffs, who elected to pursue their right of action against the divertees, and have thus lost all right of action against the United States.

(4) The plaintiffs billed the diverted coal to the divertees, and have by them been paid in full, thus having no further cause of action, or one for nominal damages only.

The first two defenses we think to have been foreclosed by the rulings in the other cases between the same parties. The third defense is, we think, disposed of by the fact finding that the plaintiffs made no election to bring their action against the divertees,

but, on the contrary, have elected to sue and have sued the United States. The whole defense centers upon its fourth branch. Upon this the fact finding is made that the plaintiffs did bill the coal to the divertees, and the bills were paid in full.

### Reply.

The plaintiffs deny that under the pleadings the defendant is in a position to interpose this defense. This is based upon the proposition (for which many authoritative cases are cited) that under the Pennsylvania Practice Act of 1915 (Pa. St. 1920, §§ 17181–17204) the statement of claim and affidavit of defense constitute the pleadings by which the case is put at issue, and that upon the issues thus raised the case must be tried. This proposition of procedural law we accept, but we are of opinion that the averments to the effect that the moneys paid by the divertees, and accepted by the plaintiffs was "a settlement" of the whole of the plaintiffs' claim, made this an issue presented by the defense as clear as a plea of "payment with leave," etc., would have presented it under the old practice. We in consequence find that this defense has been pleaded.

The further reply of the plaintiff starts with the proposition (with which we are in full accord) that, in a suit upon the cause of action of private property taken for public use, the action is to all intents and purposes one upon a quantum meruit, in which the plaintiffs have the right to recover just compensation, which is measured by the fair value of the property taken. The second proposition is one of fact, to wit, that what was paid was less than this value.

In view of the final conclusion we have reached, there is no need to go into the question of values, further than to find (as we do) that the sum received by the plaintiffs is less than what we find the value of the coal to have been when taken. If counsel desire it, we will make a specific finding of this value, so that, if it is ruled that the plaintiffs should have judgment for more than nominal damages, the appropriate judgment may be entered by stipulation.

The final proposition is that the acceptance of the sums of money paid was due to the duress to which the plaintiffs were subjected. This latter is what is sometimes called a mixed question of fact and law, or one in which fact and law are mingled. It is essentially a fact finding, consisting of evidentiary facts, from which the ultimate fact or truth of duress or no duress is deduced. The evidentiary facts are many. We group a sufficient number of them as found facts, from which the conclusion of duress can be drawn, if at all:

The plaintiffs, as we have already found, were dealers in coal. They dealt on a large scale. The number of their customers was likewise large. They had sold coal to a number, which, although not absolutely accurate, may be called for present purposes a thousand or more. This coal had been bought at a price and sold at a price subject to delivery. They must pay for what they bought, and they could not receive payment until they delivered. The United States stopped the delivery, and hence their whole business income. Had the United States taken for its own direct use, the coal would have been paid for when taken, if there was agreement upon its value, or in any event 75 per cent. of its assumed value would have been paid at the time. No dealer would by such a taking have been driven out of business. As, however, the position of the United States was that it had merely "diverted," but had not "taken," it repudiated all liability to pay, or at all events refused to make any payment either in full or any percentage on account. This meant nothing less than complete paralysis of plaintiffs' activities and an early business demise.

Failing in their efforts to get anything out of the United States, the plaintiffs turned (because they could do nothing else) to the divertees, finally offering to bill the coal to them at a price which we find to be no more than the price they had the right to charge. This offer was rejected. The plaintiffs then offered to accept any sum the divertees were willing to pay on account, reserving the right to recover whatever additional sum might be due them. The divertees refused to make any payment, with such condition or reservation attached to its acceptance. They did offer, however, if the coal was billed to them at a price which represented the cost of the coal to the plaintiffs plus 15 cents per ton advance, to pay this price in settlement for the coal. The plaintiffs felt forced to accept this, as the consequence of a refusal and the only alternative was business death.

The logic of the pleadings and trial thus comes to this:

1. The plaintiffs made out a prima facie case for a sum which measures just compensation.

2. The defendant proves a billing of the coal by the plaintiffs to the divertees at a price, and the payment of that sum to the plaintiffs, the receipt for which is set up as the equivalent of a release for all damages caused by the taking of the coal.

**3.** The plaintiffs reply that the release was given under duress, which the defendant denies. Hence the issue.

### Duress.

The issue thus becomes the one of duress. There is an analogy between society and the life of an individual. In childhood we are objective, and live with the things outside of us, real or imagined. When we are older, we live more and more subjectively, and are concerned more with our own thoughts than with objects outside of ourselves, and more with concepts of real or imagined things than with real things. There has been a like change as our civilization has grown older. Duress is not restricted and limited, as it once was, to the pressure of what partakes more or less of the physical.

The trend of the modern cases, some of which we have listed, is that a threat or menace of evil of such character as would induce a man of ordinary firmness to do an act, because of the threatened evil, which he would not otherwise do, is legal duress. It is to be noted, however, that there is always present the threat of an evil proceeding from the one to be benefited by the act done, or the threat of a refusal on his part to remove the menace of an evil which he is in duty bound to remove.

The fact situation here, when analyzed, fairly presents other elements:

1. The "taking" of the coal was in the exercise of the power of eminent domain, and in itself lawful.

2. The right of the owner is to just compensation, not to its immediate adjustment and payment. Most of the state Constitutions phrase the right as that of the owner to have payment or security. The Constitution did not use the security phrase, doubtless for the reason that it was not anticipated, or even thought possible, that the United States would ever exercise the power of eminent domain, otherwise than for itself directly, or the responsibility of the United States was deemed to be a sufficient security.

3. The plaintiffs, by the act of the United States in taking, but refusing payment, in whole or part, were put wholly at the mercy of the divertees to get money, or in the certainty of a business death after a very short interval.

The summary of all this is that the plaintiffs were put in the position of being so hard up for ready money as to be compelled to accept any terms on which it might be offered them or "to go broke." In the present case they elected to take the offered price for their coal. We are fully prepared to find that they would have preferred a higher and to them better price, and were in a real and very practical sense coerced into taking the lower price by the unrelenting pressure of the need of ready money. The history of mankind and the common experience prove that no better illustration of an instrument of real duress could be found. Tyranny has no weapon to force a people into helplessness equal in effectiveness to the power to control the volume of ready money to be had for the use of the people. So fully is this power, when wielded by one individual to the hurt of another, deemed to be a public menace, that the law has intervened to prevent its abuse by regulating rates of interest.

We in consequence make the finding, for whatever it may be worth, but to the full extent of its meaning, that the plaintiffs, by the taking of their property, were put into a position of the need of ready money so strong that the only alternative open to them was to make the best terms they could with the divertees or submit to business ruin. They made their election in the form of the acceptance of the sums paid, and it was in this sense a voluntary act, because the offer was of the "take it or leave it" variety.

We make the fact findings as broadly favorable to the plaintiffs as the evidence warrants, in order to squarely face the question which, as we view it, is presented. That question is whether the acceptance of a price because of the pressure exerted by the condition of being "hard up" is legal duress, giving the seller the legal right to recover, in addition to the sum paid, the difference between "a fair price" and what was paid. We assume the answer to be negative, when the pressure of need is the only pressure exerted. The question here, however, must be answered, of course, with the thought in mind that the sale is not voluntary, but is essentially a legal fiction. A case may be imagined in which a taking under the exercise of the power of eminent domain does a real damage to the owner. We thus qualify the statement, because ordinarily an owner gets his best price when he sells to the public. We put these plaintiffs within the exception, because we have found as a fact that what was paid them was less than "just compensation."

In passing upon the general question arising out of this cause, we must first bring what may be called the natural feeling of right and of injury into consonance with what the law pronounces to be a legal right or legal injury. If private property be taken for public use without just compensation, this "natural judgment" would pro-

nounce the act a wrong done. The judgment of the law is wholly different. Private owners are merely permitted users of property, all of which belongs to the public, which may resume the full rights of ownership at will. There is in consequence nothing of a wrong in the taking. The public has, however, promised through a constitutional or statutory enactment (usually both) that, if they take, they will give just compensation. This founds a legal cause of action, which would not otherwise exist. The analogue thus becomes that of a supposititious sale, with no price named, and the offer by the vendee of a price which the seller has accepted. If there had been a contract price, and the payment to the vendor of a less price, a wholly different question would be presented. Here there was no price named, and the sole complaint of the vendor is that the pressure of his financial necessities induced him to accept the payment of a less sum than he believed (and as we find) to have been the sum to which he was legally entitled.

The limits of an opinion (which we have already passed) forbid the discussion of the cases to which we have been referred. We, because of this, content ourselves with a part listing of them, accompanied by the statement that we find no warrant in any of them for more than a judgment for nominal damages in favor of the plaintiffs.

We take the space to add the comment that a part of the argument of the defendant upon the question of duress, and some of the cases cited, do not face the case presented. The counsel for plaintiffs does not assert that there was any duress exerted in the appropriation of the coal, or that there was anything unlawful in the taking. What he does contend, and that very vigorously, is that the acceptance of the payment which is set up as the receipt of just compensation was not a voluntary act, but induced by a coercion which was in effect legal duress. Some of the cases are Swift Co. v. United States, 111 U. S. 22, 4 S. Ct. 244, 28 L. Ed. 341; Robertson v. Frank Bros. Co., 132 U. S. 17, 10 S. Ct. 5, 33 L. Ed. 236; Cleaveland v. Richardson, 132 U. S. 318, 10 S. Ct. 100, 33 L. Ed. 384; Hartsville Oil Mill v. United States, 271 U. S. 43, 46 S. Ct. 389, 70 L. Ed. 822.

It may be further stated, in order to make sure of the fact situation to which the ruling now made applies, that the application of many of the cases cited to us by defendant is not seen. When a government does not take, either directly for its own use or ultimately for the use of others, but merely sends out a regulating price, at which commodities are directed to be dealt in by dealers, we can readily understand why the government is not answerable, because some one has sold at a less price than, without the regulation, might have been secured. Here, however, the United States actually "took" the coal of the plaintiffs. Certainly the "divertees" did not "take" it, because they had neither the legal right nor the physical power to so do. To argue, as counsel for the defendant seems to do, that the United States, when it took, did not take, because the taker then said it was not "taking," but merely "diverting," is to fly squarely in the face of Davis v. Newton, 267 U. S. 292, 45 S. Ct. 305, 69 L. Ed. 617.

We have ruled the two causes on the assumption that the plaintiffs have received payment for their coal, if they are not at liberty to treat the sum received as a payment on account of just compensation. There are some expressions to be found which might mean that this is not true of the whole of the several claims made. This, however, may be set right in the formal judgments entered. To us the real case is that of a sale with no price named; the rendering of a bill at a price; the refusal by the vendee to pay this price, or any sum on account, reserving the question of the proper price; the offer by the vendee of a price, with acceptance by vendor and payment. Had the payment been by the party against whom the cause of action was asserted, the judgment should go for defendant. As, however, here the payment was not by the defendant, it goes merely to the damnum, leaving the cause of action untouched, and the judgment properly is for the plaintiffs for nominal damages.

Præcipes for judgments in accordance with this opinion may be submitted, and on them appropriate judgments will be entered.