OLSON v. UNITED STATES.
KARLSON v. SAME.
BREWSTER v. SAME.
Nos. 9279–9281.

Circuit Court of Appeals, Eighth Circuit.
Aug. 17, 1933.

I. K. Lewis, of Duluth, Minn. (John H. Hougen, of Crookston, Minn., C. E. Berkman, of Chisholm, Minn., and Lewis, Hunt & Palmer, of Duluth, Minn., on the brief), for appellants.

Henry N. Benson and Chester S. Wilson, both of St. Paul, Minn., for the State of Minnesota.

Donald D. Harries, Sp. Asst. U. S. Atty., of Duluth, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and D. N. Lindeman, of Duluth, Minn., Atty. for United States War Department, on the brief), for the United States.

John E. Read, of Ottawa, Canada, K. C. for the Government of Canada.

Before STONE and BOOTH, Circuit Judges, and WYMAN, District Judge.

STONE, Circuit Judge.

These are three separate appeals by landowners from judgments awarding damages in a condemnation proceeding prosecuted by the United States against the lands of each.

These lands border the Lake of the Woods, which is a large body of water partly in the state of Minnesota and partly in Canada. The surface area of the lake is approximately 1,500 square miles with its outlet, by the Winnipeg river, in Canada. There are natural water power sites along that river. In order to utilize and develop these power possibilities, it is necessary to regulate the outflow of the water from the lake so as to maintain a dependable, uniform rate of flow during all seasons. This regulation of outflow must be secured by dams by which the flow can be controlled. The effect of such a dam is to restrain the outflow, to use the lake as a sort of reservoir, and to raise the natural level of the lake. A raised level overflows shore lands. The lands involved here are shore lands so affected and it is this character of damage or taking which is in question.

In 1898, the Keewatin Power Company (a Canadian corporation) constructed, for power purposes, such a control dam in Cana-

BOOTH, Circuit Judge, dissenting.

da, near Kenora. It utilized the lake as a reservoir and caused an average rise in the lake level of about three feet with resulting invasion of the shore lands. This flooding of shore lands has intermittently continued since 1898 and is substantially the level to be maintained hereafter. No damages were paid for this overflowing of lands.

In 1909, a treaty was made between the United States and Great Britain "relating to boundary waters" (Jan. 11, 1909, 36 Stat. part 2, p. 2448). This treaty established an International Joint Commission which, within defined limits, was given jurisdiction over "all cases involving the use or obstruction or diversion of the waters" (article 8 of treaty) covered by articles 3 and 4 of the treaty and respecting which those two articles required the approval of the commission. This jurisdiction expressly included "uses for power * * * purposes" (art. 8). This treaty was general and did not specifically mention the Lake of the Woods.

The commission was organized and the Lake of the Woods situation was referred to it. The final report (May 18, 1917) of the commission was submitted to the two governments and resulted in the "Treaty and protocol * * * to regulate the level of the Lake of the Woods" (July 17, 1925, 44 Stat. part 3, p. 2108). This treaty provided that "the level of Lake of the Woods shall ordinarily be maintained between elevations 1056 and 1061.25 sea level datum, and between these two elevations the regulation shall be such as to ensure the highest continuous uniform discharge of water from the lake" (article 4). There were other provisions applying to exceptional water conditions. An International Lake of the Woods Control Board was established to secure maintenance of the levels provided in the treaty. In article 8 is a provision that: "A flowage easement shall be permitted up to elevation 1064 sea level datum upon all lands bordering on Lake of the Woods in the United States, and the United States assumes all liability to the owners of such lands for the costs of such easement." Article 9 provided:

"The United States and the Dominion of Canada shall each on its own side of the boundary assume responsibility for any damage or injury which may have heretofore resulted to it or to its inhabitants from the fluctuations of the level of Lake of the Woods or of the outflow therefrom.

"Each shall likewise assume responsibility for any damage or injury which may hereafter result to it or to its inhabitants from the regulation of the level of Lake of the Woods in the manner provided for in the present Convention."

To carry into effect this Convention of 1925, the Act of May 22, 1926 (44 Stat. part 2, p. 617) and an amendatory act (April 18, 1928, 45 Stat. 431) were passed. These two acts provided that the Secretary of War should investigate and report to Congress on claims for "damages caused, prior to the acquisition of flowage easements under this Act." The secretary was required to acquire, by purchase or condemnation, "the flowage easements up to elevation one thousand and sixty-four sea-level datum upon all lands in such State [Minnesota] bordering on the Lake of the Woods, Warroad River, and Rainy River." Such condemnations were to be in accordance with the Act of August 1, 1888 (25 Stat. 357 [40 USCA §§ 257, 258]) and "with the constitutional provisions of the State of Minnesota which provide that private property shall not be taken, destroyed, or damaged for public use without just compensation therefor first paid or secured."

Being unable to secure these flowage rights upon various tracts by purchase, a condemnation proceeding was instituted, which included lands owned by these appellants. Commissioners were appointed to assess damages to the several tracts sought to be condemned and reported damages as to each. Both the United States and each of these appellants appealed from the awards of the commissioners. The appeals as to the tracts owned by these three appellants were, by agreement and order, consolidated for trial before a jury. From judgments of awards of damages as to the tracts owned by each of these appellants each of them has brought his separate appeal. They are consolidated for hearing and determination in this court.

But one main issue is involved in these appeals. It is raised in the record in various ways—by exclusion of evidence, refusal to charge, and the charge to the jury. The issue is whether the use of these properties for flowage purposes is such a use as, under the circumstances here, can be considered as an element of that value for which compensation must be made. Appellants present their argument under three distinct points, each of which has the same purpose and effect—to allow compensation for this flowage use value.

Point I is that this reservoir or flowage easement was at the time of taking under

this action and for years before had been an existing, established easement; that it was a "unit" of value of the land; that it was such "unit" alone which was taken and, therefore, that the *measure* of value for compensation should be the value of this taken unit and not the difference between the values of the entire tract before and after taking under this action. Point II is that, whatever *measure* of value (either the above unit or the above difference) be applied, the taking of this existing and established use is a proper element of value in damages and compensation because such use existed at, prior to and independent of this condemnation, is such as may be advantageously employed by others than this condemnor and is such as naturally would or actually has increased the market value of the property. Point III is that the fair annual rental value of the flowage use is an element in compensation for taking of such use. All of these matters have been presented by counsel upon both sides with great ability and with commendable clearness and fairness. About all that could have been put before us, both for and against, has been presented and the court has been materially aided thereby.

## I. The Unit Measure.

The brief of appellants reads: "Appellants urge that *compensation* for property taken, rather than *damage* to their remaining estate, be employed as the measure of their compensation, because it is more consistent with sound reasoning, and because it more clearly *points out* the error of the trial court"—that error being "the exclusion of all evidence of the most valuable use [flowage] which their property has served for thirty years and for which it is adaptable." The *discussion,* by appellants, of this urged measure of compensation may be helpful in scrutinizing the claimed erroneous action of the trial court, but the vital inquiry under this "point" is whether "it is more consistent with sound reasoning" to employ this unit measure of value.

The reasoning of appellants is that the "orthodox method of assessing just compensation is to determine the value of the whole property before and after the taking and compute the difference"; that this method came into practice in condemnations of rights of way for roads or railroads under circumstances which did not require the taking of the entire property affected; that "a different rule obtains where the entire unit of property is taken"; that the unit rule

applies "where the property taken is a separate unit or species of property, and is capable of being acquired and transferred independently of the land on which it may be located"; that "easements of all kinds are dealt with in the law as property, separate and distinct, just the same as any other item of property"; that the matter here dealt with is a "flowage easement"; that flowage rights and reservoirs are listed and valued for rate and taxation purposes, are sold and dealt in as separate units, and conveyances thereof are recorded as such under the laws of Minnesota; that it is "good business and sound economics to treat storage reservoirs and flowage easements as separate units of property"; and that, as to this particular easement, it appears that it is a complete, existing unit of property and has been for thirty years, is being condemned for identically the same use it has served for that period, will be perpetually so used, the entire unit is taken and appellants have expressly waived all claim for damages to their remaining property.

In the examination of adjudicated cases, it is suggested that, as to some, there has been confusion and failure to distinguish "between *compensation for property taken* when it is all taken, and *damages to the remaining estate* when the property is not all taken.*" It is urged that here "all of the flowage rights, and all of the flowage property belonging to appellants is being taken, *and appellants have expressly waived all claims for damage to their remaining property;* also, that it is important to distinguish between easements long in existence and use before condemnation and easements brought into being by such proceedings."

"Sound reasoning," as employed here, must be understood, of course, in a legal sense. As to this, appellants properly admit that the "orthodox method of assessing just compensation is to determine the value of the whole property before and after the taking and compute the difference." However, they contend that "a different rule obtains where the entire unit of property is taken," that an entire unit of property is (in this sense) taken where it is "capable of being acquired and transferred independently of the land on which it may be located," and all of such unit is taken and that this easement is of that character.

It must be conceded that there are many kinds of easements which are capable of being acquired and transferred independently of the land on which they may be located.

Also, that flowage easements are of that character. As to *all* of the flowage right (treated here as a "unit") being taken, the record does not support such assertion. It is clear that flowage rights are taken to the extent needed by this improvement, but the record tends rather to support the view that there existed other flowage rights beyond (higher than) those taken—otherwise, why the provisions of the treaty limiting the maximum flowage (Treaty and Protocol of February 24, 1925, arts. 4, 7, 8, 44 Stat. 2108) and appointing a Control Board (arts. 3, 5) to supervise the water levels. At least it is certain there is no showing here that the maximum flowage level of this taking is the entire possible flowage level of the lands. Thus while it is not shown that all of the possible flowage rights of these lands are taken, yet the situation is one of a flowage easement capable of separate acquisition and transfer. Does this situation bring this easement within a rule of separate unit valuation for condemnation purposes? Appellants cite International Paper Co. v. United States, 282 U. S. 399, 51 S. Ct. 176, 75 L. Ed. 410; United States v. Cress, 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746; Carondelet Canal & Nav. Co. v. Louisiana, 233 U. S. 362, 388, 34 S. Ct. 627, 58 L. Ed. 1001; Adams v. C. B. & N. Ry. Co., 39 Minn. 286, 290, 39 N. W. 629, 1 L. R. A. 493, 12 Am. St. Rep. 644; 1 Dunnell's Minn. Digest, § 3057; 20 C. J. 593; and 20 C. J. 655. International Paper Co. v. United States, 282 U. S. 399, 51 S. Ct. 176, 75 L. Ed. 410, was a suit for damages by a lessee of water flowage right for the taking thereof. The only thing taken was the only thing owned by the plaintiff, to wit, the right to water flowage under its lease. The "unit" was the subject of separate ownership by that plaintiff. United States v. Cress (also U. S. v. Kelly et al.), 243 U. S. 316, 37 S. Ct. 380, 61 L. Ed. 746, were cases for damages from flowage caused through water raised by dams. It was held (Cress Case) that as to certain lands intermittently overflowed the taking constituted an easement (page 329 of 243 U. S., 37 S. Ct. 380, 61 L. Ed. 746); that as to destruction of a ford and private right of way thereto recovery could be had therefor as damage *to the land to which it was appurtenant* (page 329 of 243 U. S., 37 S. Ct. 380, 61 L. Ed. 746); that (Kelly Case) the right to unobstructed flow away from a mill dam "is not a mere easement or appurtenance" and destruction of such right is "a taking of a part of the land" (page 330 of 243 U. S., 37 S. Ct. 380, 386, 61 L. Ed. 746). Carondelet Canal & Navigation Co. v. Louisi-

ana, 233 U. S. 362, 34 S. Ct. 627, 58 L. Ed. 1001, involved the question of impairment of a contract by state legislation. This depended upon whether a contract between the state and the company provided for compensation by the state when it took over a canal and related works constructed and operated by the company for fifty years under the contract. No issue of eminent domain was involved. The expression in the opinion, intended by citation of appellants, is (page 388 of 233 U. S., 34 S. Ct. 627, 635, 58 L. Ed. 1001): "It may be that it did not own the canal, or the bayou, or the old basin. Indeed, ownership of their soil was disclaimed at the bar. But, we repeat, there was valuable property which the statute contemplated could revert and could be compensated for. Monongahela Navigation Co. v. United States, 148 U. S. 312, 13 S. Ct. 622, 37 L. Ed. 463." Here the entire property and *title* thereto was in the company, separate from the ownership of the land, and that entirety was the unit for which the company was entitled to compensation. Adams v. C. B. & N. Ry. Co., 39 Minn. 286, 39 N. W. 629, 1 L. R. A. 493, 12 Am. St. Rep. 644, was an action for damages to property through operation of a railway along the street in front. The holding was that plaintiff had an easement for light and air *to this lot* and, for deprivation thereof, he could recover damages *to the lot.* Dunnell's Digest, § 3037, is a statement that "an easement is property and may be 'taken' within the meaning of the Constitution," citing the Adams Case, supra. 20 C. J. 593, § 83, and 655, § 131, recognize easements appurtenant to land as property subject to eminent domain. The result of these citations is not to sustain the contention of appellants that where an easement is *capable* of separate acquisition and transfer it is a unit for condemnation valuation purposes. The rule is that an easement is such unit only where, prior to condemnation, it has been severed *in ownership* from the fee. International Paper Co. v. United States, 282 U. S. 399, 51 S. Ct. 176, 75 L. Ed. 410. Even though the ownership of the easement has been severed from the ownership of the land upon which it is imposed, the easement is not such unit if it is appurtenant to—enjoyed in connection with—land of the owner of the easement. In such cases, the damage for taking is the injury to the land to which it is thus appurtenant. United States v. Cress, 243 U. S. 316, 329, 37 S. Ct. 380, 61 L. Ed. 746 (ford and right of way thereto); United States v. Grizzard, 219 U. S. 180, 185, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. (N. S.)

1135; United States v. Welch, 217 U. S. 333, 339, 30 S. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680. In the Welch Case (page 339 of 217 U. S., 30 S. Ct. 527, 54 L. Ed. 787, 28 L. R. A. (N. S.) 385, 19 Ann. Cas. 680) the court said: "* * * the value of the easement cannot be ascertained without reference to the dominant estate to which it was attached." This criterion of separate ownership is further illustrated in Sharp v. United States, 191 U. S. 341, 351–356, 24 S. Ct. 114, 48 L. Ed. 211, where several entirely separate tracts were owned by the same person and one only was taken, and in Boston Chamber of Commerce v. Boston, 217 U. S. 189, 30 S. Ct. 459, 54 L. Ed. 725, where several different characters of ownerships endeavored to combine in seeking damages to the tract. In the latter case (page 195 of 217 U. S., 30 S. Ct. 459, 460, 54 L. Ed. 725) the court said: "But the Constitution does not require a disregard of the mode of ownership,—of the state of the title. It does not require a parcel of land to be valued as an unencumbered whole when it is not held as an unencumbered whole. It merely requires that an owner of property taken should be paid for what is taken from him. It deals with persons, not with tracts of land."

Application of the above-established principle to the situation here must result in ruling this point I against appellants because there is here neither separate ownership nor separate tract of land taken.

## II. Flowage Use.

Appellants' second and main contention is that the flowage use of their lands for power reservoir purposes is an element of value proper to be considered in determining the damage from this taking. They contend that the uses to which land taken may be applied are properly and always considered as elements of value; that this flowage use existed at the time of this taking and had for years prior thereto; that such is the most valuable use of the lands; and that such use naturally tends to and actually has affected the market value of these lands. The position of the government is that all of the above considerations are overridden for the reasons that any influence of flowage use on the value of these lands was impossible because the union of the properties necessary to this improvement was impracticable save by international agreement and eminent domain; because of the impossibility of obtaining authority to regulate lake levels for power purposes; because control of the lake outlets was necessary for any enjoyment of this use for pow-

er purposes and possibility of acquiring such control was removed by appropriation thereof by the Canadian government, since 1898, for navigation purposes; and because the right of flowage upon these lands had been reserved by the United States in the laws under which these lands were opened for entry.

[3, 4] In so far as is necessary for a determination of this matter, the law applicable thereto is as follows. The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." "Compensation" means recompense or "equivalent" (Monongahela Nav. Co. v. United States, 148 U. S. 312, 326, 13 S. Ct. 622, 37 L. Ed. 463) to the owner and has no relation to advantage to the taker (United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 76, 33 S. Ct. 667, 57 L. Ed. 1063; McGovern v. N. Y., 229 U. S. 363, 371, 33 S. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391; United States v. Grizzard, 219 U. S. 180, 183, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. [N. S.] 1135; Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195, 30 S. Ct. 459, 54 L. Ed. 725; Monongahela Nav. Co. v. United States, 148 U. S. 312, 343, 13 S. Ct. 622, 37 L. Ed. 463). "Just" means a fair money equivalent for what is taken—its fair money value. Where there is an actual current market value for things of the kind taken, that, naturally, fixes the fair money value. Davis v. George B. Newton Coal Co., 267 U. S. 292, 301, 45 S. Ct. 305, 69 L. Ed. 617; United States v. New River Collieries Co., 262 U. S. 341, 43 S. Ct. 565, 67 L. Ed. 1014; Vogelstein & Co. v. United States, 262 U. S. 337, 43 S. Ct. 564, 67 L. Ed. 1012. However, most condemnations are of real estate or of interests therein where conditions as to valuation are different (Sharp v. United States, 191 U. S. 341, 349, 350, 24 S. Ct. 114, 48 L. Ed. 211) and no such actual market value exists. However, "market value" is still the standard (De Laval, etc., Co. v. United States, 284 U. S. 61, 72, 52 S. Ct. 78, 76 L. Ed. 168; McCoy v. Union Elev. R. R. Co., 247 U. S. 354, 365, 38 S. Ct. 504, 62 L. Ed. 1156; United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 81, 33 S. Ct. 667, 57 L. Ed. 1063; United States v. Grizzard, 219 U. S. 180, 183, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. [N. S.] 1135), but it must be determined otherwise than by current market prices. In such situations, the definition of market value is "the sum that would in all probability result from fair negotiations between an owner who is willing to sell and a purchaser who desires to buy." De Laval, etc., Co. v. United States, 284 U. S. 61, 73, 52 S. Ct. 78, 80, 76 L. Ed.

168; Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123, 44 S. Ct. 471, 68 L. Ed. 934. The time for which the value is determined is the time of taking (De Laval Co. v. United States, 284 U. S. 61, 72, 52 S. Ct. 78, 76 L. Ed. 168; Phelps v. United States, 274 U. S. 341, 344, 47 S. Ct. 611, 71 L. Ed. 1083; Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123, 125, 44 S. Ct. 471, 68 L. Ed. 934; Vogelstein & Co. v. United States, 262 U. S. 337, 43 S. Ct. 564, 67 L. Ed. 1012; Monongahela Nav. Co. v. United States, 148 U. S. 312, 341, 13 S. Ct. 622, 37 L. Ed. 463), and this is unaffected by an unlawful taking prior to and existing at the time of lawful taking (Searl v. School District, 133 U. S. 553, 10 S. Ct. 374, 33 L. Ed. 740).

■ In using this defined standard no account is given to values or necessities peculiar to the seller (Mitchell v. United States, 267 U. S. 341, 344, 345, 45 S. Ct. 293, 69 L. Ed. 644; Monongahela Nav. Co. v. United States, 148 U. S. 312, 326, 13 S. Ct. 622, 37 L. Ed. 463), or the buyer (United States v. Chandler-Dunbar Co., 229 U. S. 53, 76, 33 S. Ct. 667, 57 L. Ed. 1063; McGovern v. N. Y., 229 U. S. 363, 371, 33 S. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391; Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195, 30 S. Ct. 459, 54 L. Ed. 725), but only such matters as would affect the ordinary seller and buyer in negotiating a fair price. In reality the result sought and reached is what the trier of fact finds is a fair sales value. To reach this result, such trier may consider all matters which would naturally influence agreement upon a price by sellers and buyers willing but not compelled to bargain. Obviously, the uses to which property may be put vitally affect its value. But "use" in this sense does not mean mere physical adaptability. A square block of firm land anywhere in the United States is physically adapted to support a towering office building, but very few have any value for that purpose. It is *use adaptability* which concerns us. Since value is to be determined as of the time of taking, it is use adaptability apparent at that time. Since market value is the standard sought, it is use adaptability which would affect market value at the time of taking—that is, which would influence a seller and a buyer in arriving at a fair price then. The above considerations limit the uses which may be shown. Such uses include not only present use (Phelps v. United States, 274 U. S. 341, 344, 47 S. Ct. 611, 71 L. Ed. 1083; Mitchell v. United

States, 267 U. S. 341, 344, 345, 45 S. Ct. 293, 69 L. Ed. 644; Hanson Lumber Co. v. United States, 261 U. S. 581, 590, 43 S. Ct. 442, 67 L. Ed. 809; Monongahela Nav. Co. v. United States, 148 U. S. 312, 328–330, 13 S. Ct. 622, 37 L. Ed. 463), but other uses. The difficulty in many adjudicated cases has been to determine when potential uses may be shown. Since they must be such as would influence market value at the time of taking, the Supreme Court has ruled that they must be "probable * * * within some reasonable time" (Sharp v. United States, 191 U. S. 341, 356, 357, 24 S. Ct. 114, 118, 48 L. Ed. 211) or "probably be desired and available for" (United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 77, 33 S. Ct. 667, 677, 57 L. Ed. 1063) or "considerable enough to be a practical consideration and actually to influence prices" (McGovern v. N. Y., 229 U. S. 363, 372, 33 S. Ct. 876, 877, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391), but cannot be such as are "speculative, remote, and not shown to be commercially practicable" (United States v. Coronado Beach Co., 255 U. S. 472, 488, 41 S. Ct. 378, 380, 65 L. Ed. 736) nor "too remote and speculative to have any legitimate effect upon the valuation" (McGovern v. N. Y., 229 U. S. 363, 372, 33 S. Ct. 876, 877, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391). Whether a potential use is such as may be shown within the above definitions, naturally, depends largely upon the circumstances of each situation (McGovern v. N. Y., 229 U. S. 363, 373, 33 S. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391), but one factor is "demand for the use" (Monongahela Nav. Co. v. United States, 148 U. S. 312, 328, 13 S. Ct. 622, 627, 37 L. Ed. 463; Kerr v. South Park Comm., 117 U. S. 379, 387, 6 S. Ct. 801, 29 L. Ed. 924). Also, and particularly pertinent to our case, where the use depends upon assembly of numerous tracts separately owned the probability of uniting or acquiring all of them necessary to the use is an important—maybe a controlling—consideration in determining whether the use is "too remote and speculative to have any legitimate effect upon the valuation" (McGovern v. N. Y., 229 U. S. 363, 372, 33 S. Ct. 876, 877, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391, and, see, United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 80, 33 S. Ct. 667, 57 L. Ed. 1063), and "In estimating that probability, the power of effecting the change by eminent domain must be left out" (McGovern v. N. Y., 229 U. S. 363, 372, 33 S. Ct. 876, 877, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391, and see United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53,

80, 81, 33 S. Ct. 667, 57 L. Ed. 1063). The things we deem material to bear in mind in the foregoing statement of the law are that existing uses influence values; that potential uses are not considered if they are remote and speculative; that they are remote and speculative if the use depends upon the union of numerous tracts, variously owned, and such union is improbable; and that in determining such probability the power of eminent domain must be excluded.

■ With these matters in mind we turn to the facts here. Appellants press strongly the fact that this use at the time of and for years prior to the taking in this condemnation was an actual existing use. That is true. Was the use here of the character and within the proper intendment of the decisions or, outside of those decisions, is it logically to be regarded as a use which would influence market value of these lands? The decisions above cited as to actual use at the time of taking (and there are many others from various courts) all have to do with a use by the owner which would pass to a buyer of the land and of which the owner is deprived by the taking. The actual use here is through an unlawful trespass. Secombe v. Milwaukee & St. Paul Railroad Co., 23 Wall. 108, 118, 23 L. Ed. 67. This trespass established the physical adaptability of the lands for this flowage for power purposes. What effect had the establishment of such fact upon the sales value of the lands which would influence a seller and buyer of such at the time of this taking? For more than thirty years, these lands had borne the burden of this trespass to their detriment without hope of redress. There was no such hope because this trespass was occasioned by works erected in the outlet of the lake within a foreign territory by a foreign company acting under authority of the foreign government. During that entire time there could exist no value to the owner or to a prospective buyer in this use of flowage. It was a positive reducer of value. It rendered part of the land unfit for any purpose to the owner or such a buyer. Nor was there any hope of compensation for continued usage which could possibly have added to the sales value of the land. It was a peculiar and unfortunate situation where the landowner was helpless. There was no demand for this use by anyone who would or could be made to compensate him therefor. It had been appropriated under circumstances which were beyond his power to remedy. Then there came a change. Opening the matter by the general Treaty of 1909, the govern-

ment sought to cure this unjust situation by the Convention of 1925. This it did by assuring the levels of the lake (the measure of intrusion upon the lands) and by voluntarily assuming to pay compensation therefor. It was not until the Convention of 1925 that there was any possibility of the landowner receiving *any* compensation for this taking of his land. Nor has there been before or since any possibility of any other demand for such use. In this situation (which existed at the time of this condemnation taking), it seems to us, justice to the landowner and to the public[1] would demand that this flowage use be excluded from estimation of sales value of the lands unless it can be seen that such use was properly an element of such value, irrespective of these actualities. In other words, if such use was properly an element of such value before this trespass then it continued to be such in spite thereof and should be taken into account—otherwise not. We think it should not be so regarded for the reasons following.

At the time of this taking by condemnation, the Lake of the Woods covered about 1,500 square miles. The shore line (main shore and islands) is estimated at 3,093 miles (United States 188, Canada 2,905) or 2,225 miles (United States 140, Canada 2,085). Lands affected by the condemnation flowage level comprise a great number of separate tracts variously owned. In Canada: 15,000 acres are owned by the Province of Ontario, 16,000 acres by the dominion (in Manitoba), over 30 tracts are Indian reservations, and there are 723 tracts privately owned. The Canadian public lands had been withdrawn from settlement some years with a view to this character of improvement. In the United States: The United States owned something less than 11,000 acres, the state of Minnesota owned one fair-sized tract, 850 tracts were privately owned by about 775 owners, with over 1,200 other persons having legal interests (mortgagees, etc.) therein. Added to the considerations of multiplicity of tracts and ownership are the patent difficulties of successfully dealing with various governmental units and Indian tribes. To assemble all of this flowage affected land would require acquisition of the rights of this great number of persons (including two na-

[1] Compensation must be just not only to the landowner but to the public (Searl v. School District, 133 U. S. 553, 562, 10 S. Ct. 374, 33 L. Ed. 740; Garrison v. City of N. Y., 21 Wall. 196, 204, 22 L. Ed. 612), and all of the circumstances and elements at the time of taking must be considered (Brooks-Scanlon Corporation v. United States, 265 U. S. 106, 123, 124, 125, 126, 44 S. Ct. 471, 68 L. Ed. 934).

tions, one state, two provinces, Indian tribes, and private persons) in this large number of separately and variously owned tracts. We cannot think that such an eventuality held that degree of probability or possibility which could affect the value of these lands and be an influence or consideration affecting, in the slightest degree, the minds of sellers and buyers thereof in arriving at a fair price therefor. Such use is too remote and speculative to have such effect in fact and, therefore, can have none in law.

■ To this it may be said that the rejected offer of proof was to show that prices had actually been so affected. That prices of these privately owned lands would be affected by the prospect of purchase or condemnation of the flowage rights under the Convention of 1925 is entirely probable and natural. Before that convention, such a tract of land would be worth only its usage for agricultural or fishing purposes with the burden of the flowage actually there and the most which could be vaguely hoped for would be the removal of the flowage and the resultant use, for the above purposes, of the overflowed land. With the convention came the certainty of compensation for the overflowed land. To the extent of this compensation, the value of the lands would be increased to the owner and, therefore, would be a factor in sales price thereof. Beyond this, there is no vestige of reason for an increase. Even if owners and buyers might actually have thought that this compensation would include an enhancement from use for flowage purposes, there was no justification in law for such view. Such thought could spring only from the convention which had in mind this very improvement and values arising because of the particular improvement cannot be included in compensation. McCoy v. Union Elev. R. Co., 247 U. S. 354, 366, 38 S. Ct. 504, 62 L. Ed. 1156; United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 76, 77, 80, 33 S. Ct. 667, 57 L. Ed. 1063; Monongahela Nav. Co. v. United States, 148 U. S. 312, 326, 13 S. Ct. 622, 37 L. Ed. 463; Shoemaker v. United States, 147 U. S. 282, 305, 13 S. Ct. 361, 37 L. Ed. 170; Kerr v. South Park Comm., 117 U. S. 379, 386, 387, 6 S. Ct. 801, 29 L. Ed. 924. Also, this convention clearly provided for accomplishment of acquisition through eminent domain and where the use is possible only through the exercise of that power, "it must be left out" (McGovern v. N. Y., 229 U. S. 363, 372, 33 S. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. [N. S.] 391) in estimating the probability of such a use as affecting sales value and compensation. With

no further examination of the difficulties urged by appellee, we think the trial court correctly excluded consideration of this flowage use as an element of value.

### III. Rental Value.

■ In view of what has been above determined as to point II, little need be said as to the contention of appellants that the annual rental value of this flowage use was improperly denied consideration. This suit is not concerned with compensation for the use of flowage rights *prior* to the taking under this condemnation. That is a different situation under rules of law (Secombe v. Railroad Co., 23 Wall. 108, 118, 23 L. Ed. 67; Searl v. School District, 133 U. S. 553, 564, 10 S. Ct. 374, 33 L. Ed. 740) and, under the Convention of 1925, art. 9, is to be cared for by a separate and different method. The problem in this action is whether flowage use value is a proper element of sales-market-value to be considered in determining the compensation due the landowners. If (as we have above held) this use cannot be properly considered, it is obvious that we are not concerned with any method of estimating the value of such denied use. Annual rental value thereof has no other purpose either in fact or in the decisions cited by appellants.

### Conclusion.

The judgments must be, and are, affirmed.

BOOTH, Circuit Judge (dissenting).

With great reluctance I find myself unable to agree with the opinion of the majority of the court. The main issue in the cases is thus clearly stated in the majority opinion: "The issue is whether the use of these properties for flowage purposes is such a use as, under the circumstances here, can be considered as an element of that value for which compensation must be made."

Two incidental questions are discussed in the majority opinion. I shall pass them by, as I do not think they are of decisive importance.

The crucial question is, in my judgment, whether the use of the land for reservoir or flowage purposes is a proper element to be considered in determining the compensation to be made in the condemnation proceedings.

The majority opinion contains the following: "Appellants press strongly the fact that this use at the time of and for years prior to the taking in this condemnation was an actual existing use. That is true. Was the use here of the character and within the proper intendment of the decisions or, outside of

those decisions, is it logically to be regarded as a use which would influence market value of these lands? The decisions above cited as to actual use at the time of taking (and there are many others from various courts) all have to do with a use by the owner which would pass to a buyer of the land and of which the owner is deprived by the taking. The actual use here is through an unlawful trespass. Secombe v. Milwaukee & St. Paul Railroad Co., 23 Wall. 108, 118, 23 L. Ed. 67. This trespass established the physical adaptability of the lands for this flowage for power purposes. What effect had the establishment of such fact upon the sales value of the lands which would influence a seller and buyer of such at the time of this taking? For more than thirty years, these lands had borne the burden of this trespass to their detriment without hope of redress. There was no such hope because this trespass was occasioned by works erected in the outlet of the lake within a foreign territory by a foreign company acting under authority of the foreign government. During that entire time there could exist no value to the owner or to a prospective buyer in this use of flowage. It was a positive reducer of value. It rendered part of the land unfit for any purpose to the owner or such a buyer. Nor was there any hope of compensation for continued usage which could possibly have added to the sales value of the land. It was a peculiar and unfortunate situation where the landowner was helpless. There was no demand for this use by anyone who would or could be made to compensate him therefor. It had been appropriated under circumstances which were beyond his power to remedy. Then there came a change. Opening the matter by the general Treaty of 1909, the government sought to cure this unjust situation by the Convention of 1925. This it did by assuring the levels of the lake (the measure of intrusion upon the lands) and by voluntarily assuming to pay compensation therefor. It was not until the Convention of 1925 that there was any possibility of the landowner receiving any compensation for this taking of his land."

I cannot agree with some of the ultimate facts and legal conclusions contained in the foregoing statement of the situation, and cannot agree with the conclusion of the majority opinion that flowage use should be excluded from an estimation of sales value of the lands.

The situation, as I think the record discloses, at the time of the present condemnation proceedings in 1929 was substantially as follows:

(1) Both the building of the Rollerway Dam in 1887 and the building of the Norman Dam in 1895–1898 had produced trespasses by flowage upon the lands here involved. These trespasses were committed either by private parties or by private parties jointly with the Canadian government. They continued down to the time of the present condemnation proceedings. These trespasses are conceded in the majority opinion; and it is further conceded that these trespasses established the physical adaptability of the lands for flowage purposes.

The adaptability for flowage use may not be an element of value; but the adaptability when utilized for such flowage use may contribute to the land a very material element of value.

In the cases at bar we have the adaptability. We also have the utilization of the adaptability. Both are conceded.

(2) But it is argued in the majority opinion, if I understand it, that the utilization of the adaptability does not contribute to the land any element of value because the utilization was a trespass and there was no hope of recovery for the trespass. This, I think, is erroneous.

As early as 1895, complaints were made by the owners of lands in the United States bordering on the lake that their lands were being overflowed as the result of the dams mentioned. These complaints were made to the United States government, but they were not brought to the attention of the Canadian government. A fair inference from the record is that the reason for this inaction was not because the trespass which was being committed was one for which there was no redress, but because the United States engineers were of the opinion that the flooding complained of was produced not by the dams mentioned, but by natural causes. In other words, the United States engineers labored under a mistaken belief as to the correct location of the high-water mark of the Lake of the Woods in its natural state. The complaints of the landowners, however, continued, and attorneys were employed; but it was not until the International Joint Commission made its final report on the Lake of the Woods in 1917 that it was conclusively proven that the landowners were right and the United States engineers were wrong, and that the Rollerway Dam and the Norman Dam had raised the level of the lake several feet above its level in its natural state.

The fundamental fact upon which a claim for damages by reason of flowage must rest was thus established after about twenty-two years of trespass had elapsed.

This finding of the International Joint Commission did not create a cause of action in behalf of the landowners; it simply furnished proof of one of the facts to establish such cause of action.

The cause of action existed long prior to the Treaties of 1909 and of 1925; and the cause of action was of recognized value long before the condemnation proceedings were begun. This is shown by the record.

Article 2 of the Treaty of 1909 (36 Stat. 2448, 2449) provides that: "Any interference with or diversion from their natural channel of such waters on either side of the boundary, resulting in any injury on the other side of the boundary, shall give rise to the same rights and entitle the injured parties to the same legal remedies as if such injury took place in the country where such diversion or interference occurs."

The International Joint Commission also recognized the value of the flowage use. In its report it said: "Maintaining the lake at a low level is clearly uneconomical, even from the viewpoint of the agricultural interests; and when the other interests involved are considered, it becomes apparent that, looking to the uses that will procure the best results, riparian lands are more valuable for flowage purposes than for agricultural purposes."

Article 9 of the Treaty of 1925 (44 Stat. 2108, 2110) recognized that the cause of action for trespass by past overflow was not of chimerical value. That article provided: "The United States and the Dominion of Canada shall each on its own side of the boundary assume responsibility for any damage or injury which may have heretofore resulted to it or to its inhabitants from the fluctuations of the level of Lake of the Woods or of the outflow therefrom."

Article 10 of said treaty provided (page 2111): "The Governments of the United States and Canada shall each be released from responsibility for any claims or expenses arising in the territory of the other in connection with the matters provided for in Articles VII, VIII, and IX."

And the act to carry into effect the provisions of the Treaty of 1925 (44 Stat. 617) contained the following: "Sec. 3. The Secretary of War is hereby authorized and directed to cause to be investigated, as soon as practicable, all claims for damages caused, prior to the acquisition of flowage easements under this Act, to the inhabitants of the United States by fluctuation of the water levels of the Lake of the Woods due to artificial obstructions in outlets of said lake, and after due notice and opportunity for hearing, shall ascertain and determine the loss or injury, if any, that may have been sustained by the respective claimants and to report to Congress for its consideration the amount or amounts he may find to be equitably due such claimants. * * *"

It is thus apparent that a flowage use value of the lands in controversy existed long prior to the Treaty of 1925, and that such flowage use value was finally recognized by both the United States and the Canadian governments; and that such flowage use value was actual and not chimerical and that it existed prior to and independently of any condemnation proceedings.

(3) Nor was the situation of the landowner as to recovery of such flowage use value as damages from the trespassers one of mere hopeless speculation. Were this the case, it would be a reproach to both governments concerned. On the contrary, it is, in my opinion, a reasonable and safe conclusion that once the facts were established, the landowner could get compensation in damages in the courts of Canada, if the trespass had been committed by private parties; and probably could obtain compensation by petition of right, if the flowage use had been taken by authority of the Canadian government (see Halsbury's Laws of England, vol. 1, p. 17, pars. 21, 22, 23, and 24; and vol. 10, pp. 26–30; also vol. 2 D. L. R. [1928], p. 625, annotation "Petition of Right" by Arthur S. Bourinot); and certainly he could obtain redress through diplomatic action between the two governments.

Such, substantially, was the situation, in my judgment, when the present condemnation proceedings were brought.

The amendatory act of Congress for carrying into effect the provisions of the Treaty of 1925 (45 Stat. 431) provides that condemnation proceedings shall be "in accordance with the constitutional provisions of the State of Minnesota."

Section 13 of article 1 of the Constitution of the State of Minnesota provides: "Private property for public use—Private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured."

What constitutes "private property" within the meaning of the state Constitution

has been passed upon many times by the Minnesota State Supreme Court.

In Adams v. Chicago, Burlington & Northern R. Co., 39 Minn. 286, page 290, 39 N. W. 629, 631, 1 L. R. A. 493, 12 Am. St. Rep. 644, the court, in discussing the constitutional provision, said: "All property, whatever its character, comes within its protection. It is hardly necessary to say that any right or interest in land in the nature of an easement is property, as much so as a lien upon it by mortgage, judgment, or under mechanic's lien laws. If a man is deprived of his property for the purpose of any enterprise of public use, it must be a taking, even though the right of which he is deprived is not and cannot be employed in the public use."

This rule has been followed in numerous cases, among them: Minneapolis, St. P., R. & D. Elec. T. Co. v. Searle, 208 F. 122 (C. C. A. 8); Lamm v. Chicago, St. Paul, Mpls. & Omaha Ry. Co., 45 Minn. 71, 47 N. W. 455, 10 L. R. A. 268; Gustafson v. Hamm, 56 Minn. 334, 57 N. W. 1054, 22 L. R. A. 565.

And the courts of Minnesota have been liberal in admitting testimony as to the value of private property taken. Duluth & Winnipeg R. Co. v. West, 51 Minn. 163, 53 N. W. 197; Cedar Rapids, etc., Ry. Co. v. Ryan, 37 Minn. 38, 33 N. W. 6; Russell v. St. Paul, Mpls. & Man. Ry. Co., 33 Minn. 210, 22 N. W. 379; King v. Mpls. Union Ry. Co., 32 Minn. 224, 20 N. W. 135; Sherman v. St. Paul, Mpls. & Man. Ry. Co., 30 Minn. 227, 15 N. W. 239; Colvill v. St. Paul & Chicago Ry. Co., 19 Minn. 283 (Gil. 240); Weaver v. Mississippi & Rum River Boom Co., 28 Minn. 534, 11 N. W. 114.

In the case last cited, the court, speaking by Justice Mitchell, said: "No principle is more firmly implanted in American constitutional law than that private property shall not be taken for public use without compensation; and, in view of the fact that the government is granting so much of its prerogative franchise to private or quasi public corporations in theory for public purposes, but often practically in part for private benefit, the exercise of which involves injury to or the taking of private property, there is no constitutional guaranty that requires to be more zealously guarded against encroachment than the one referred to."

In the Russell Case the court said (page 213 of 33 Minn., 22 N. W. 379, 380): "Any existing facts which enter into the value of the land in the public and general estimation, and tending to influence the minds of sellers and buyers, may be considered."

The same liberal rule has been followed by the Supreme Court of the United States. The case of Mississippi & R. River Boom Co. v. Patterson, 98 U. S. 403, 25 L. Ed. 206, is quite pertinent to the cases at bar. In the Patterson Case a boom company sought to condemn three small islands in the Mississippi river so situated with reference to each other and the river bank as to be peculiarly adapted to form a boom a mile in length. The question in the case was whether their adaptability for that purpose gave the property a special value which might be considered. The Supreme Court held that the adaptability of the land for the purposes of a boom was an element which should be considered in estimating the value of the lands condemned, and the court said, relative to the rule for estimating damages (page 408 of 98 U. S., 25 L. Ed. 206): "So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

The same liberal tendency in the admission of evidence in condemnation cases is shown in an exhaustive opinion by Judge Gardner of this court in the recent case of Union Electric Light & Power Co. v. Snyder Estate Co. (C. C. A.) 65 F.(2d) 297.

It should be kept clearly in mind that the testimony sought to be introduced in the cases at bar, but excluded, was not offered for the purpose of obtaining damages for past trespass, but solely for the purpose of establishing an existing and established element of value of the land, to be considered by the jury in fixing the compensation for the acquirement of a flowage easement for the future; and, further, that the testimony sought to be introduced, but excluded, was not offered for the purpose of establishing a value of the flowage use which had come into existence by reason of the commencement of the condemnation proceedings. The testimony was proffered for the purpose of establishing the value of a flowage use which had existed

for many years and which value was claimed to be an important element in the total value of the particular land taken.

In addition to proof of the adaptability of the lands involved for flowage or reservoir use, and of the actual use of said lands for said purpose for many years, the landowners offered to prove that shore lands similar to those involved had been purchased long prior to the present condemnation proceedings because of their use for storage or reservoir purposes; and that larger prices were paid for such lands for that reason; that the conditions affecting the Lake of the Woods, and existent before the condemnation proceedings were commenced, were such as would naturally affect the market value and market price of shore lands; that the market value and market price of shore lands similar to those involved were in fact affected by their adaptability for use, coupled with actual use for flowage or reservoir purposes; that it was reasonably certain that the interests controlling the power projects below the outlet of the lake would seek to acquire flowage rights had not the Treaty of 1925 been made; that there was competition between Ontario interests and Winnipeg interests in regard to the acquirement and control of the Lake of the Woods reservoir; that such flowage rights had a well-recognized rental value; and the amount of such rental value.

Deeds were offered, but excluded, which conveyed similar lands bordering Lake of the Woods and which contained a reservation in the grantor of any right to past damages by reason of wrongful flowage of said lands.

All of the testimony along the lines mentioned and similar lines was excluded on the grounds that it was too speculative, did not go to the true measure of damages, and on various other similar grounds.

The government contended, among other things, that before flowage or reservoir use of said shore lands could be an element of value of said lands, there would have to be a unification of the many titles to the shore lands and a control of the waters of said lake.

It seems to me that the question is one of fact whether the adaptability for reservoir or flowage purposes coupled with the long-continued actual use for such purposes entered into the value of such lands or not. Whether such element of value would have been greater if the titles to the various parcels had been unified is not material; nor is it material whether or not there *should have been logically* no element of value in the lands based upon adaptability and use for reservoir purposes until the titles were unified. Unification of the titles may have been somewhat impracticable, but co-operation between the various owners including the United States and Canada (even by acquiescence) as to maintenance of lake levels was not impossible, but an established fact, even though the exact extent of the co-operation was not definitely fixed.

The question whether the adaptability, coupled with the actual use, did in fact enter into the value of the lands was, in my opinion, for the jury, and the question should have been submitted under proper instructions.

There is no point raised as to the sufficiency of the offers to prove; and the charge of the court was explicit. It read: "In computing the fair market value, both before and after the imposition of the easement, you will take into consideration all of the uses for which the property was available on May 4th, 1929, and May 5th, 1929, and determine what use it was most valuable for, and base your award thereon; but you will not make an award based on any claim for reservoir value. I have held that under the law the value of these lands could not be based upon the use of the lake and its shores for reservoir purposes. It is, as I understand it, conceded that the only other use for which these lands are suited, with the exception perhaps of Mr. Olson's tract, is for agricultural purposes, or purposes relating to agriculture, so that it is for those purposes that you are to value these lands."

The offers to prove, the rulings thereon, and the charge of the court were all made pursuant to an agreement by court and counsel that the crucial question should be raised and embodied in the record by offers to prove and by charge of the court, as the clearest and most concise way of presenting the question to the appellate court.

The rulings of the court on the offers to prove and the charge of the court were, it seems to me, contrary to the spirit, if not to the express provisions, of the Treaty of 1925 and the act of Congress for carrying it into effect.

The treaty provides (article 9, supra): "The United States and the Dominion of Canada shall each on its own side of the boundary assume responsibility for any damage or injury which may have heretofore resulted to it or to its inhabitants from the fluctuations of the level of Lake of the Woods or of the outflow therefrom."

The statute above quoted (44 Stat. 617)

provides for an ascertainment of damages to the landowners by reason of flowage prior to the treaty.

The rulings of the court on the offers to prove and the charge of the court, however, held in effect that as a matter of law there could be no such damages.

The cases of United States v. Chandler-Dunbar, etc., Co., 229 U. S. 53, 33 S. Ct. 667, 57 L. Ed. 1063; McGovern v. New York, 229 U. S. 363, 33 S. Ct. 876, 57 L. Ed. 1228, 46 L. R. A. (N. S.) 391; and New York v. Sage, 239 U. S. 57, 36 S. Ct. 25, 60 L. Ed. 143, relied upon by the appellce, lend support rather to the contentions of appellants in the cases at bar, when comparison is made between the facts disclosed in those cases and the facts disclosed in the cases at bar.

In the Chandler-Dunbar Case, the court said (page 76 of 229 U. S., 33 S. Ct. 667, 677, 57 L. Ed. 1063): "The exception taken to the inclusion as an element of value of the availability of these parcels of land for lock and canal purposes must be overruled. That this land had a prospective value for the purpose of constructing a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose." Citing the case of Boom Co. v. Patterson, supra.

In the McGovern Case there had been no prior actual use of the land for a reservoir site (the purpose for which the land was being condemned) and the court held that the landowner could not recover as damages for the taking of his land any part of the enhanced value thereof due to the condemnation proceeding.

In the Sage Case there had been no prior actual use of the land for a reservoir site (the purpose for which the land was being condemned) and the court followed the holding in the McGovern Case.

In the cases at bar it was conceded that at the time of the condemnation proceedings and for many years prior, the lands sought to be taken had an actual as distinguished from a potential use for flowage or reservoir purposes; and the offers to prove tended to show that this actual use at the time of the condemnation proceedings and for years prior thereto had a value; and the offers to prove tended also to show that at the time of the condemnation proceedings and for years prior thereto this use value was an element entering into the value of the lands here involved.

For the reasons outlined above, I am of the opinion that the proffered evidence along the above-mentioned lines should have been received, and that the charge of the court, above quoted, was erroneous.

I think the judgments should be reversed.